FILED
2006 SEP 14 PM 3:23
U.S. D[...]
N.D. OF AL[...]

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | |
|---|---|
| SIERRA CLUB, et al, | ] |
| Plaintiff, | ] |
| | ] |
| v. | ] CASE NO.: CV-02-HS-2279-NW |
| | ] |
| TENNESSEE VALLEY AUTHORITY, | ] |
| Defendant. | ] |

**ENTERED**
SEP 14 2004

## Memorandum Opinion

This matter is before the Court on Cross Motions for Summary Judgment by the Parties (docs 24 and 26). This is a civil action filed by the Plaintiffs Sierra Club and Alabama Environmental Council, Inc. ("AEC") against the Defendant Tennessee Valley Authority ("TVA") for declaratory and injunctive relief and the imposition of civil penalties under the Federal Clean Air Act, 42 U.S.C. §§ 7401-7671q. The action also seeks an order penalizing and enjoining TVA's excessive emission of harmful air pollutants from the TVA Fossil Plant in Tuscumbia, Colbert County, Alabama ("Colbert Plant") in violation of the Clean Air Act, the Alabama State Implementation Plan, 40 C.F.R. § 52.69 *et seq.* and previously at 40 C.F.R. § 52.50 *et seq.*, and the TVA Colbert Plant's Air Permit, 701-0010-Z009 through 701-0010-Z013. The Complaint alleges one Count of violation of the act for exceeding "opacity" limits on emissions from the plant. The issue is whether TVA violated the act on each of around 9,000 occasions, where undisputed machine recorded levels showed opacity exceeding allowable limits. The Court finds that the evidence does not show that TVA was in violation of the Clean Air Act on each of these occasions for the reasons stated herein.

82

## I. UNDISPUTED FACTS

### A. Operation of the Colbert Plant

TVA, operates a number of fossil fuel fired electricity generating plants throughout the Tennessee Valley. One of those plants is the Fossil Plant in Tuscumbia, Colbert County, Alabama (the "Colbert Plant"). The Colbert plant began initial operation in 1955. Boilers one through four at the plant (hereinafter referred to as "Colbert units 1-4"), were placed into operation in 1955. The fifth boiler at the plant (hereinafter referred to as "Colbert unit 5"), was placed into commercial operation in 1965. All of these units are electric utility steam generating units. At least some airborne combustion by-products from units 1-4 are emitted from a common, 600 foot smoke stack. Combustion by-products from unit 5 are emitted through a second, 500 foot smoke stack. It is the emissions from these stacks which form the basis of this litigation.

### B. Regulatory Framework

The District Court in *National Parks Conservation Association v. Tennessee Valley Authority*, 175 F. Supp.2d 1071 (E.D. Tenn. 2001), properly outlined the regulatory relationship between the state and federal government in this area as follows:

> The Clean Air Act enacts a cooperative scheme of federal and state responsibility for achieving national air quality standards. The Environmental Protection Agency (EPA) is directed to identify air pollutants and to promulgate national ambient air quality standards specifying acceptable levels of those pollutants. 42 U.S.C. §§ 7409-10 (1994). The EPA has adopted such standards. Each state is required to adopt and submit to EPA a State Implementation Program (SIP) specifying the methods that that state will use to attain the air quality standards set by EPA. EPA reviews the SIP to determine whether it meets specified criteria and, if it does, EPA must approve of it. 42 U.S.C. § 7410. The State may devise the particular components of its own plan so long as the plan is adequate to meet the standards promulgated by EPA. The State may also propose revisions to its plan and submit them to EPA for approval.

*National Parks Conservation Ass'n, Inc. v. Tennessee Valley Auth.*, 175 F. Supp. 2d 1071, 1074 (E.D. Tenn. 2001). The Alabama SIP is a series of air regulations generally contained within Alabama Department of Environmental Management ("ADEM") Rules 335-3-1 through 335-3-15.

In this case, the Plaintiffs cite a violation of Rule 335-3-4-.01(1), which reads as follows:

> 335-3-4-.01 <u>Visible Emissions</u>.
>
> (1) <u>Visible Emissions Restrictions for Stationary Sources</u>.
>
> (a) Except as provided in subparagraphs (b), (c), (d), or (e) of this paragraph, no person shall discharge into the atmosphere from any source of emission, particulate of an opacity greater than that designated as twenty percent (20%) opacity, as determined by a six (6) minute average.
>
> (b) During one six (6) minute period in any sixty (60) minute period, a person may discharge into the atmosphere from any source of emission, particulate of an opacity not greater than that designated as forty percent (40%) opacity.
>
> (c) The Director may approve exceptions to this Rule or specific sources which hold permits under Chapter 335-3-14; provided however, such exceptions may be made for startup, shutdown, load change, and rate change or other short, intermittent periods of time upon terms approved by the Director and made a part of such permit.

ADEM Admin. Code R. 335-3-4-.01(1). To determine compliance with this provision, the rule provides:

> (2) Compliance with opacity standards in this Rule shall be determined by conducting observations in accordance with Reference Method 9 in Appendix A, 40 CFR Part 60, as the same may be amended requiring a six (6) minute average as determined by twenty-four (24) consecutive readings, at intervals of fifteen (15) seconds each.

ADEM Admin. Code R. 335-3-4-.01(2). The Method 9 system

> is a visual monitoring method by which a trained individual periodically observes a smoke plume from outside the plant to determine the opacity of the plume. Method Nine observations are performed in daylight, when the sun is at a certain angle, and the plume is at a certain angle in relation to the stack. The EPA regulations leave it to the states to determine how often Method Nine testing should be done.

*National Parks Conservation Ass'n, Inc.*, 175 F. Supp. 2d 1071, 1074 (E.D. Tenn. 2001).

ADEM rules also require fossil fuel-fired steam generators of the type at issue in this case to install "[a] continuous monitoring system for the measurement of opacity." 335-3-12-.02. These continuous opacity monitoring systems are commonly referred to as "COMs". It is undisputed that TVA is required to file with ADEM, quarterly, computer-generated reports of this data.

It is undisputed that these were the rules for measuring opacity until May 20, 1999, when the following regulation, ADEM's so-called "credible evidence rule", became effective. It provides as follows:

> 335-3-1-.13 <u>Credible Evidence</u>.
>
> * * *
>
> (2) <u>Enforcement</u>. Notwithstanding any other provision in ADEM Admin. Code Division 3, any credible evidence or information relevant to whether a source would have been in compliance with applicable requirements if the appropriate performance or compliance test had been performed, can be used to establish whether or a not an owner or operator has violated or is in violation of any rule or standard in this Division.

ADEM Admin. Code R. 335-3-1-.13(2).

It is undisputed that the foregoing regulations are <u>now</u> all part of both ADEM's rules and the SIP. However, a final provision for the Court's consideration, is ADEM Admin. Code R. 335-3-4-.01(4), which reads:

> (4) During each calendar quarter, the permittee will not be deemed in violation of Rule 335-3-4-.01(1) if the non-exempt excess emissions periods do not exceed 2.0 percent of the source operating hours for which the opacity standard is applicable and for which the COMS is indicating valid data.

ADEM Admin. Code R. 335-3-4-.01(4). This is what the parties have referred to as the so-called "2% de-minimis" rule. The parties agree that ADEM formally adopted this rule <u>after</u> the events at

issue in this case, and that the rule is still not part of the Alabama SIP.

**C.     COMs Data**

The COMs monitor for units 1-4 is located 435 feet above grade level in the combined stack for these units. The monitor for unit 5 is located between 252 and 262 feet above grade level in the stack for that unit. It is undisputed that these units do not measure opacity from the same point in the exhaust plume that a Method 9 observer would. In other words, COMs are inside the stacks and a Method 9 observer must observe exhaust as it leaves the stacks. The COMs in the stacks of the Colbert plant continuously measure, except for periods of downtime, the amount of light that can pass through the exhaust of the power plant before such exhaust is emitted into the atmosphere. The opacity data collected by the COMs is retained in a computer at the Colbert plant for some period of time.

Within the five (5) year statute of limitations period, Colbert's COMs data and reports demonstrate that Colbert has emitted exhaust of an opacity greater than 20% as determined over a six minute average around 9,000 times over many different days. This is the Plaintiffs' only evidence of violations and is the evidence upon which their entire case is based. There is no Method 9 testing evidence.

**D.     Relevant Procedural History**

Plaintiff's Complaint asks this Court to issue injunctive relief against TVA in their favor; declare that TVA has violated the CAA; and order TVA to pay costs and damages for its alleged violations. By Order of February 20, 2003, Judge Inge P. Johnson dismissed all claims for civil penalties (doc. 13)–effectively converting this case into one for just declaratory and injunctive relief.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is only proper if there are no genuine disputed issues of material fact, and the moving party is entitled to judgment as a matter of law.

*Walton v. Johnson & Johnson Services, Inc.*, 347 F.3d 1272, 1279 (11th Cir. 2003).

> Summary judgment is only proper where no genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If a reasonable jury could not find in favor of the nonmoving party, no genuine issue of material fact does exist; and summary judgment is proper. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994). A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997). As Fed.R.Civ.P. 56(e) states, "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."

*Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004).

### B. Analysis

#### 1. TVA Has Not Violated the Clean Air Act

##### a. Violations Occurring Prior to May 20, 1999

The Plaintiffs argue that COMs readings can be used to show exceedances despite the fact that the opacity compliance rule expressly calls for Method 9 testing to be done to determine compliance. *See* ADEM Admin. Code R. 335-3-4-.01(2). Specifically, they argue that

> the Alabama SIP's Credible Evidence Rule, Rule 335-3-1-.13(2), expressly overrides any contrary provision of the Alabama SIP, including Rule 335-3-4-.01(2), and provides that any credible evidence that is relevant to whether a source would have been in compliance with applicable requirements had a specified performance or compliance test been conducted can be used to prove a violation.

*Plaintiff's Memorandum in Support of Summary Judgment*, at 34. This is the Plaintiffs' primary

6

basis for its argument that the Court should consider COMs data. However, the credible evidence rule was not effective prior to May 20, 1999. Accordingly, there is no authority for using opacity testing data other than Method 9 prior to that date. Method 9 proof does not exist in this case. Accordingly, for violations which are alleged to have occurred before May 20, 1999, the Defendant's Motion for Summary Judgment will be **GRANTED** on the claims for declaratory relief and the Plaintiffs' Motion for Summary Judgment will be **DENIED** as to those same claims. Similarly, the Defendant's Motion for Summary Judgment will be **GRANTED** as to all claims for injunctive relief springing from these alleged violations, and the Plaintiffs' Motion for Summary Judgment will be **DENIED** as to those same claims.

### b. Violations Occurring On and After May 20, 1999

#### I. COMs Data Is Properly Considered for This Period

TVA explains that its position is that "opacity is properly measured either by Method 9 visual observations or, after the effective date of the credible evidence rule, by COMS measurements subject to a 2% *de minimis* rule." *TVA's Response Brief in Opposition to Plaintiffs' Motion for Summary Judgment*, at 5-6. Accordingly, both parties agree that COMs data is properly considered during this period.

#### ii. Application of The 2% De Minimis Rule

The 2% de minimis rule was not formally adopted by ADEM at the time of the events complained of, although it has since been so adopted. It is not, however, part of the SIP. It is undisputed that COMs readings occur continuously, 24 hours per day, 7 days per week, 365 days per year. The Plaintiffs insist that each and every record of an excess opacity emission made by the COMs is a violation by the Defendant.

Defendant insists that "the standard – when translated from its original formulation which was inherently based on periodic Method 9 compliance tests – is not violated as long as non-exempt COMs readings greater than 20% do not occur more than 2% of the time." *TVA's Response Brief in Opposition to Plaintiff's Motion for Summary Judgment*, at 9 [emphasis added]. In essence, it argues that because the compliance testing *method* was periodic (*i.e.* the Method 9 testing agent would only come out every now and then), the standard only requires the plant to be in *periodic* compliance. The Defendant writes:

> TVA's position, following ADEM's interpretation, is *not* that COMS readings could never be used at all for any purposes, but rather that COMS readings cannot be used in one-to-one correspondence to prove violations. Instead, COMS evidence is subject to a 2% *de minimis* "translation" to maintain a stringency equivalent to the Method-9-based opacity standard.

*Id.* at 12.

Defendant argues that "because ADEM's credible evidence rule states only general principles and provides no guidance about how to judge opacity if it is measured by COMS rather than Method 9 . . . it is necessary to resort to ADEM's authoritative interpretations of its regulations in order to apply them properly in this concrete situation." *Id.* at 10. It argues that the approach to using the 2% de minimis rule is in the mainstream and is used by ADEM. *Id.* at 12.

Defendant insists that using COMs without the 2% de minimis rule *changes* the rule from one requiring periodic compliance to one requiring continuous compliance. *Brief in Support of TVA's Motion for Summary Judgment*, at 19-22. It insists that the rule was put in place with the idea of a period compliance standard, and that anything else would make the rule more stringent–possibly even unachievable. It insists that ADEM uses this approach when analyzing COMs data received from the Colbert plant, and that, during the period at issue in this suit, ADEM has always noted that

8

the plant is in compliance despite the COMs data. *Id.* at 25.

Defendant insists that the canons of statutory construction dictate that an impossible result not be required by a construction of a statute. It states that it is "literally impossible for any power plant's COMS readings to *always* be below 20%, *all the time*." It also argues that ADEM's interpretation of the regulatory language should be given great weight, and that the placement of the COMs in the stacks is well below visible range–which could provide improper measurements of the true opacity.

In response, the Plaintiffs argue that, despite the testing method, the law requires compliance to be continuous not periodic. Plaintiffs insist that the 2% de minimis standard would make the rule less, not more stringent. It also states that the placement of COMs makes no difference–they are calibrated to account for such placement.

It is clear what ADEM's position on the standard is now. The 2% de minimis standard applies. The Defendant also offered as evidence of ADEM's prior position, ADEM's May 24, 2003, proposed rule changes, where it proposed to adopt this 2% standard. *TVA Exhibit* 13 [Proposed ADEM Admin. Code. R. 335-3-4-.01(4)]. In the "Summary of Reasons" for adopting the standard, ADEM states that the proposed revisions "would serve to codify the practices that [the] Department has been and is currently utilizing regarding COMS data." *TVA Ex.* 14 [Emphasis supplied.] ADEM also notes that many other jurisdictions have adopted this standard. The court's own research into other state's regulations confirms that to be true.

However, since this was not the *law* but rather ADEM's practice at the time at issue in the case, the question then becomes, can TVA, who was consistently told by ADEM that its COMs data showed no violation because it was within the 2% de minimis rule, rely on that to overcome a citizen

9

suit based on the plain language of the regulation? Put another way, does ADEM's practice of employing the 2% rule make that rule the law?

Defendant characterizes this as "ADEM's statement that it is clarifying existing law, rather than changing the law." *TVA's Brief in Support of Summary Judgment*, at 24. Accordingly, it contends that its interpretation is to be given much deference.

The Alabama Supreme Court has held:

> This court and the trial court must give substantial deference to an agency's interpretation of its rules and regulations. It is well settled that an agency's interpretation of its own regulation must stand if it is reasonable, even though it may not appear as reasonable as some other interpretation. An agency's interpretation of its own policy is controlling unless it is plainly erroneous.

*Ex Parte Bd. of Sch. Comm'rs of Mobile County*, 824 So. 2d 759, 761 (Ala. 2001). Since the 2% de minimis standard has now been adopted by ADEM, and many other jurisdictions had it in place at the time of the events of this case, this Court cannot say that ADEM's interpretation was plainly erroneous. This Court must also defer to ADEM's interpretation of its own regulations. *See Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1293 n. 7 (11th Cir. 2001) ("if Florida courts must defer to agency interpretations when construing Florida substantive law, then we [the Eleventh Circuit] must do the same"). In reviewing whether COMs data should be used to show violations, ADEM interpreted the "credible evidence rule" regarding the use of COMs data, and, it is undisputed, put into practice the 2% de minimis plan. There is no evidence that ADEM ever told TVA that the COMs data showed a violation, despite exceedances above 20% on numerous occasions. This Court is bound by that interpretation.

An analogous case, although not squarely on point, is the Tennessee District Court's opinion in *National Parks Conservation Association, Inc. v. Tennessee Valley Authority*, 175 F. Supp. 2d

1071 (E.D. Tenn. 2001). In that case, the plaintiffs, who also filed a citizen suit under the Clean Air Act, also tried to use COMs data which showed exceedances above 20% against the TVA. *Id.* at 1074. In that case, Tennessee had adopted a permitting program. The Court explained:

> The CAA does not require states to adopt an operating permit program, under which air pollution sources receive permits to operate their facilities. However, where a state voluntarily adopts such a program and submits it to EPA for approval as a part of its SIP, EPA considers such operating permit programs to be part of the approved SIP. *See* Fed.Reg. 27, 274; 27, 282 (June 28, 1989).
>
> * * *
>
> The Tennessee SIP also provides for alternate opacity standards. In particular, the SIP, which has been approved by the EPA, authorizes Tennessee and the regulated party to agree to establish "an emission limit more restrictive than that otherwise specified in this Chapter" (1200-3-5-.01(3)), and to agree to the use of continuous opacity monitoring (COM) (1200-3- 5-.01(5)).

*National Parks Conservation Ass'n, Inc.*, 175 F.Supp.2d at 1074 -1075 (E.D. Tenn. 2001).

> The SIP requires that, where the more restrictive standard is used, it shall be included as part of the source's operating permit (1200-3-5-.01(3)), and further provides that such operating permits are incorporated as part of the SIP.
>
> TVA agreed to use at its John Sevier and Kingston Plants COMs, or continuous opacity monitoring, to demonstrate compliance. The permits for the John Sevier and Kingston Plants also authorize opacity emission at these plants to exceed 20% for 2% of the time during each calendar quarter, excluding periods of permitted start-up or shut-down and excused malfunctions.
>
> The plaintiff contends that the above exceptions for certain emissions have not been approved by the EPA and are therefore invalid. TDEC has not sought approval of the EPA for these exceptions based on the belief that use of the COMs to continuously monitor the emissions from the two plants is an emission limit more restrictive than that otherwise specified in the SIP (*i.e.,* Method Nine). Under the language of the SIP, EPA approval for this more restrictive standard was not necessary.

*Id.* at 1075.

Thus the Court recognized that COMs data is a more restrictive standard because it was a

11

continuous, rather than periodic monitoring system. The Tennessee Court also noted that the permits (which stated the Tennessee regulatory agency's interpretation of the rule) contained the 2% standard and were facially valid. The Tennessee Court therefore noted that there was nothing wrong with the agency's interpretation, even though it had not specifically been approved as part of its SIP.

The parties have cited the Court to no language in the SIP that would prevent TVA and the State of Alabama from adopting an opacity limit more restrictive than that expressly stated. This Court, like the Court in *National Parks*, also determines that a continuous monitoring system is more restrictive and stringent than the opacity limit standards set out in the regulations. Like in the Tennessee case, the state regulatory agency (here, ADEM) has recognized a standard other than Method 9 for testing and has interpreted how it should be applied. While not specifically approved by the EPA during the period at issue, TVA operated under these guidelines for years before this suit was brought. Plaintiff has presented no evidence that ADEM ever cited TVA for a violation. The undisputed evidence is to the contrary. Under these circumstances, TVA was reasonable in believing that ADEM's practices in this instance were "facially valid".

The proper standard to apply the evidence in this case is the 2% de minimis standard outlined above as applied to COMs data, or Method 9 testing data. There is no evidence of Method 9 violations. None of the COMs data provided by the Plaintiffs during this period show a violation of the 2% de minimis rule. Therefore, TVA is entitled to judgment as a matter of law for violations alleged to have occurred on and after May 20, 1999. The Defendant's Motion for Summary Judgment will be **GRANTED** on the claims for declaratory relief during this period, and the Plaintiffs' Motion for Summary Judgment will be **DENIED** as to those same claims. Similarly, the Defendant's Motion for Summary Judgment will be **GRANTED** as to all claims for injunctive relief

springing from these alleged violations, and the Plaintiffs' Motion for Summary Judgment will be **DENIED** as to those same claims.

2. **The Plaintiffs Are Not Entitled to Prospective Injunctive Relief**

Because the evidence does not show a "'real and immediate threat' of future injury" the Plaintiffs are also not entitled to Prospective Injunctive Relief. *See National Parks Conservation Association v. Norton*, 324 F.3d 1229, 1241 (11th Cir. 2003) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 103-04 (1983)). As to these claims, the Defendant's Motion for Summary Judgment will be **GRANTED**, and the Plaintiffs' Motion for Summary Judgment will be **DENIED**.

### III. CONCLUSION

There is no genuine issue of material fact and the Defendant is entitled to Judgment as a Matter of Law on all claims remaining in the Complaint. Judgment on all claims will be entered in favor of the Defendant and against the Plaintiff. All other pending motions will be **DENIED as MOOT**.

Done, this __14__ day of September, 2004.

　　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　VIRGINIA EMERSON HOPKINS
　　　　　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE