FILED

2006 May-23  AM 10:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **SIERRA CLUB and ALABAMA ENVIRONMENTAL COUNCIL, INC.,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| **v.** | ) | **No. 3:02-CV-2279-VEH** |
| | ) | |
| **TENNESSEE VALLEY AUTHORITY,** | ) | |
| | ) | |
| | ) | |
| **Defendant** | ) | |

## MEMORANDUM OPINION IN SUPPORT OF ORDER TO STAY AND REFERRAL TO MEDIATION

### I.  Background and History

This is a civil action filed by the Plaintiffs Sierra Club and Alabama Environmental Council, Inc. ("AEC")[1] against the Defendant Tennessee Valley Authority ("TVA") for declaratory and injunctive relief and the imposition of civil penalties under the Clean Air Act, 42 U.S.C. §§ 7401-7671q ("CAA", "the Act"). The action also sought an order penalizing and enjoining TVA's excessive emission of harmful air pollutants from the TVA Fossil Plant in Tuscumbia, Colbert County, Alabama ("Colbert Plant") in violation of the CAA, the Alabama State

---

[1] Unless the context indicates otherwise, plaintiffs will collectively be referred to as "Sierra Club".

Implementation Plan ("SIP"), 40 C.F.R. § 52.69 *et seq.* and previously at 40 C.F.R. § 52.50 *et seq.*, and the TVA Colbert Plant's Air Permit, 701-0010-Z009 through 701-0010-Z013.  The Complaint alleged a Count of violation of the CAA each time the Colbert plant exceeded the legal "opacity" limits on emissions, or each of around 9,000 occasions where undisputed machine recorded levels showed opacity exceeding allowable limits.

Judge Johnson and I, ruling on different TVA motions, resolved all issues in favor of TVA.  Sierra Club timely appealed.  In *Sierra Club v. TVA*, 430 F.3d 1337 (11th Cir. 2005) (doc. 90), the Court of Appeals:

1)      affirmed my decision on the application of the "credible evidence" rule to this action (doc. 83);

2)      reversed my ruling that the Alabama Department of Environmental Management's ("ADEM") use of the "2% de minimis" rule was a permissible interpretation of the Clean Air Act (doc. 83), holding instead that ADEM's use of the 2% de minimis rule throughout the period in question was an illegal, unilateral modification of the Alabama SIP, 42 U.S.C. § 7410(I); 40 C.F.R. § 51.105, and that Alabama's interpretation of its state implementation plan (SIP) cannot change the Act's mandate of continuous compliance. Clean Air Act, §§ 110, 302(k), 42 U.S.C. §§ 7410, 7602(k);

3)      affirmed Judge Johnson's ruling that the Tennessee Valley Authority ("TVA") was immune from civil penalties under the Act, (Doc. 13), and

4)      remanded the action for proceeding consistent with the Court's opinion.

## II.  The Clean Air Act

I have, in various opinions entered in the other two (2) CAA cases pending before me, see Section III., below[2], set out the statutory framework and legislative history of the Act, what triggers permitting, what types of permits are involved, and what type of work at a plant, or unit, will not require a permit. I will not repeat it all again here; the parties and their counsel are at least as familiar with it as I am.  Suffice it to say that all three of my CAA cases involve two different, but complementary, provisions of the CAA: the New Source Performance Standards ("NSPS") provisions, 42 U.S.C. § 7411, and the Prevention of Significant Deterioration ("PSD") provisions, 42 U.S.C. §§ 7470 - 92.

For the reader not familiar with the other cases, the interplay of the PSD and NSPS provisions of the Act was summarized by the Fourth Circuit in a case that has the potential to become the most significant Clean Air Act decision in decades, *U.S. v. Duke Energy*, 411 F.3d 539 (4th Cir. 2005), *certiorari granted by Environmental Defense v. Duke Energy Corp., --- S.Ct. ----, 2006 WL 1310699, 74 USLW 3407 (U.S. May 15, 2006) (NO. 05-848)*:

> Since 1971, the EPA has promulgated NSPS regulations that define "modification" in virtually the same words as the statute. See, e.g.,36 Fed. Reg. 24,876, 24,877 (Dec. 23, 1971); 40 C.F.R. § 60.2 (1976); 40 C.F.R. § 60.2

---

[2]  Those cases are referred to as *Alabama Power* and *NPCA*.

(2004). In 1975, the EPA added a regulation elaborating on this definition and further defining "modification" by reference to an increase in the hourly emission rate: a modification includes "any physical or operational change to an existing facility which results in an increase in the emission rate to the atmosphere of any [regulated] pollutant," measured not in tons per year, but in kilograms per hour. 40 Fed. Reg. 58,416, 58,419 (Dec. 16, 1975) (codified at 40 C.F.R. § 60.14(a) & (b)). Modified equipment becomes subject to the NSPS's "technology-based" standards, *Alabama Power Co. v. Castle*, 636 F.2d 323, 346 (D.C. Cir. 1979), which mandate the installation of the "best demonstrated pollution control technology." *Potomac Elec. Power Co. v. EPA*, 650 F.2d 509, 518 (4th Cir.1981) [hereinafter *PEPCo*].

The NSPS program was not entirely successful. See *Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901, 904 (7th Cir.1990). In 1972, the United States District Court for the District of Columbia issued a preliminary injunction directing the EPA to promulgate regulations to supplement the NSPS program and protect air quality from deterioration in areas that had met or exceeded the relevant ambient standards. See *Sierra Club v. Ruckelshaus*, 344 F.Supp. 253 (D.D.C.1972), *aff'd* 1972 WL 2725, 4 E.R.C. 1815 (D.C. Cir. 1972), *aff'd* by an equally divided court *sub nom*. *Fri v. Sierra Club*, 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973). The EPA duly disseminated the first PSD regulations in 1974. See 39 Fed. Reg. 42,510 (Dec. 5, 1974). Congress thereafter enacted a PSD program in the Clean Air Act Amendments of 1977. See 42 U.S.C. § 7470(1).

As originally enacted, the PSD permit provisions in the Clean Air Act applied only to the "construction" of major emitting facilities. See Clean Air Act Amendments of 1977, Pub. L. No. 95-95, 91 Stat. 685, 735 (1977) ("No major emitting facility on which construction is commenced after the date of the enactment of this part, may be constructed in any area to which this part applies unless ··· a permit has been issued····"). However, in November 1977, a few months after the original enactment became effective, Congress passed the "Clean Air Act Technical and Conforming Amendments." Pub. L. No. 95-190, 91 Stat. 1393, 1399 (1977). These amendments added to the "Definitions" section of the PSD provisions in 42 U.S.C. § 7479 a subparagraph that

provides: "The term 'construction' when used in connection with any source or facility, includes the modification (as defined in [section 7411(a)]) of any source or facility." Id. at 1402. This amendment thus incorporated the NSPS statutory definition of "modification," § 7411(a)(4), into § 7479 of the PSD statute.

The PSD program imposes, inter alia, preconstruction review and permit requirements on new or modified sources in areas that have attained or exceeded their air quality standards. 42 U.S.C. § 7475. Unlike the NSPS program, the PSD program does not focus primarily on technology-based controls, but on the "net emissions from an entire plant resulting from construction or modification of one or more emitting sources within the plant." *PEPCo*, 650 F.2d at 518 (emphasis omitted). And so, while NSPS centers on technological controls at an individual pollution-emitting apparatus, PSD fixes on the actual emissions from a site. See *N. Plains Res. Council v. EPA*, 645 F.2d 1349, 1356 (9th Cir.1981) ("The NSPS program is ··· equipment oriented. On the other hand, the PSD program ··· is ··· site oriented.").

The EPA promulgated regulations under the PSD provisions of the statute in 1978, see 43 Fed. Reg. 26,380 (June 19, 1978), and amended them in 1980, *see* 45 Fed. Reg. 52,676 (Aug. 7, 1980). Under the 1980 PSD regulations, a plant cannot engage in a "major modification" of equipment without first undergoing the EPA's permit process and acquiring a permit. 45 Fed. Reg. 52,676. The EPA's PSD regulations define a "major modification" as "any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the Act."40 C.F.R. § 51.166(b)(2)(I) (1987).FN1 A "net emissions increase" is "[a]ny increase in actual emissions from a particular physical change or change in the method of operation" of a unit. 40 C.F.R. § 51.166(b)(3)(I). The PSD regulations measure emissions increases relative to a baseline calculation of "actual emissions," i.e., "the average rate, in tons per year, at which the unit actually emitted" the regulated pollutant for, usually, the two years prior to date of measurement, "using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted

during the selected time period." 40 C.F.R. § 51.166(b)(21)(ii).

> FN1. The 1980 regulations, which the parties agree control the projects at issue here, were recodified in the 1987 Code of Federal Regulations. None of the relevant PSD or NSPS provisions were revised during the period pertaining to this dispute. All subsequent references herein are to the 1987 C.F.R. unless otherwise noted.

*Duke Energy* at 543 - 544. The significance of the above language is that this, and the other cases pending before me (or on appeal from my decisions), turn in no small part on whether the definition of "modification" is the same in both the PSD and NSPS provisions, when work is routine maintenance, repair, and replacement ("RMRR") (and therefore not required to be permitted), and how emissions are measured to determine whether a modification has taken place.[3]

### III.  My Other Pending Clean Air Act Actions

This action is one of three (3) CAA actions reassigned to me upon my appointment.  The other actions are *National Parks Conservation, Inc. and Sierra Club v. Tennessee Valley Authority*, 413 F.Supp. 2d 1286 (N.D. Ala. 2006) CV-01-403-VEH ("*NPCA*"), currently on appeal to the Eleventh Circuit, and *United States v. Alabama Power Co.*, 372 F.Supp. 2d 1283 (N.D. Ala. 2005), CV-02-1296-VEH (*"Alabama Power")*.  My three (3) actions are in turn informed and affected, again to varying degrees, by four (4) decisions of the Fourth, Eleventh, and District of

---

[3] For reasons discussed in Sections III and IV, *infra*, the Fourth Circuit's *Duke Energy* "modification" analysis  under the PSD and NSPS provisions of the Act will probably not be the last word on the subject. The Fourth Circuit did not reach the emissions measurement issue.

Columbia Courts of Appeals, respectively.  The appellate decisions, in chronological

order, are *TVA v. Whitman*, 278 F.3d 1184 (11th Cir. 2002), *withdrawn in part*, 336

F.3d 1236 (11th Cir. 2003) ("*Whitman*"); *Duke Energy, supra*, *NY v. EPA*,  413 F.3d

3 (D.C. Cir. No. 02-1387, 6/24/05), *petition for rehearing en banc  denied* 431 F.3d

801 (12/9/05) ("*NY I*"), and *NY v. EPA*, 443 F.3d 880 (D.C. Cir. No. 02-1380,

3/17/06) ("*NY II*").  *Whitman*, *Duke Energy*, *supra*, and *NY I* and *II* all involve, to

some degree, the resolution of purely legal questions arising under the CAA.  Their

connection to this action, *NPCA*, and *Alabama Power* follows.

Prior to my appointment, discovery in *Alabama Power* had been stayed (June

27, 2001 - June 16, 2004), initially awaiting possible action by the Judicial Panel on

Multidistrict Litigation (the Panel denied the request, doc. 18), and then awaiting the

decision in *Whitman*.  (Docs. 29, 31, 33, 35, 37, 39, 41, 43, 45).  The stay was lifted

in response to a joint motion of the parties.  (Docs. 52 & 57).  In the first substantive

Order I entered in *Alabama Power* (doc. 63, 7/19/04), I noted the existence of parallel

CAA litigation which, while not specifically named in the Order, was *Duke Energy*,

then pending in the Middle District of North Carolina.  *U.S. v. Duke Energy

Corporation*, 278 F.Supp.2d 619 (M.D.N.C. 2003).  A subsequent scheduling Order

entered on August 5, 2003 directed the parties, *inter alia*, to file a joint stipulation as

to legal questions which were ripe for adjudication.  (Doc. 68)

On September 7, 2004, the parties, in a joint filing, identified two (2) legal issues which were ripe for adjudication:

> 1) the correct legal test for determining a physical change, including the correct legal test for determining routine maintenance, repair, and replacement ("RMRR")[4]; and

> 2) the correct legal test for determining a significant net emissions increase.[5]  (Doc. 75).

The first question has not been addressed by any appellate court since *Wisconsin Electric Power Co. v. Reilly, supra* ("*WEPCO*") (7th Cir. 1990), where the Seventh Circuit said RMRR was measured by reference to the facility itself, not the industry. In response to the parties' joint filing in *Alabama Power*, I said, among other things, that I did not believe the 11th Circuit would follow *WEPCO*, at least in part because *WEPCO* relied on the EPA Environmental Appeals Board procedure held unconstitutional by the 11th Circuit in *Whitman*.  (Docs. 140 & 141).  The *Whitman* Court mentioned, but did not decide, the first question, saying "[A] central disagreement between TVA and EPA is whether 'routine' should be defined relative

---

[4]  The dispute was whether the RMRR was to a specific unit or whether it was the type of RMRR commonly performed within the coal burning, electricity generating, utility industry.  The utilities always argue the latter; their opponents, the former.

[5]  Here the dispute is whether an emissions increase is measured by an increase in annual emissions from the unit/plant, or whether it is measured by an hourly increase.  Again the utilities say the latter; their opponents the former.

8

to an industrial category or to a particular unit." *Whitman,* 278 F.3d at 1189 (n.3).[6]

As to the second question, in an Order entered in *NPCA* earlier this year, I said:

> "The second question was answered adversely (and by that I mean adversely to NPCA's chances of proving TVA's Colbert 5 1982 - 1983 work violated the CAA) by the Fourth Circuit in *U.S. v. Duke Energy*, 411 F. 3d 539 (4th Cir. 2005) *rehearing denied,* ____ F.3d _____ (August 30, 2005).
>
> The answers to these issues could be dispositive of NPCA's ability to prove its First and Second Cause of Action claims. They are  unlikely to come from the D.C. Circuit, because *NY v. EPA* expressly declined to express an opinion ". . . as to whether Congress intended to require that EPA use identical regulatory definitions of modification across the NSPS and NSR programs.  *Cf. United States v. Duke Energy*, No. 04-1763, slip. op. at 11- 19."  413 F.3d 3, 20.[7] The 4th Circuit's use of identical definitions of modification across the NSPS and NSR programs was a critical underpinning of its holding in *Duke Energy.*

──────────────

[6]  The remainder of the footnote is worth reading, because it set out, as succinctly as any description I have read, the core RMRR dispute between the electric utility industry and EPA arising from a series of 1999 EPA CAA enforcement actions filed against the industry's coal burning electricity generating plants.  *Alabama Power* is one of those actions; *Duke Energy*, another.

**TVA contends that a maintenance or replacement project that may need to be undertaken only once or twice during the life of a particular unit-and so in that sense is not routine-is nonetheless routine within the industrial category, since it has to be done once or twice within the life of every such unit. According to TVA, EPA formerly used the "industrial category" as the baseline and is now treating the individual unit as the frame of reference instead.**

[7]  The 1980 Rule was, technically, not before the Court in *NY v. EPA* (procedural waiver/default in briefing).

9

> Those cases still  may not end the matter, because the debate over "increased actual emissions" versus "increased rate of emissions" seems determined to rise up from what I thought was its *NY v. EPA* coffin, *but see* Judge Williams's concurrence in the denial of rehearing, *supra*, [431 F.3d 801, 802 - 803].  Absent the Supreme Court's granting *certiorari* in either *NY v. EPA* or *U.S. v. Duke Energy*, if there is to be further guidance on these issues, it appears it will have to come from the 11ᵗʰ Circuit."

CV-01-403-VEH (Doc. 224, pp. 11 - 12).

In the *Alabama Power* and *NPCA* opinions and orders referenced above, and in other orders and opinions published in those actions, I said I would follow the Fourth Circuit's ruling in *Duke Energy* as to the second question, which was that improvements to a plant that increased the hours of operation which raised annual emissions, but not hourly emissions, was RMRR that did not trigger the permitting requirements of the CAA.  Put another way, such work was not a modification under the Act, triggering the permitting process and its attendant technology expenditures.

In *NY I*, the D.C. Circuit addressed the first of two rules promulgated by the Environmental Protection Agency providing ways for stationary sources of air pollution to avoid triggering New Source Review ("NSR").  The court upheld in part and vacated in part the first rule. 413 F.3d 3, 10 - 11.

In *NY II*, the D.C. Circuit reviewed the second rule, the Equipment Replacement Provision ("ERP"), which sought to amend the Routine Maintenance, Repair, and

Replacement Exclusion ("RMRR") from NSR requirements.  Under section 111(a)(4) of the Act, 42 U.S.C. § 7411(a)(4), sources that undergo "any physical change" that increases emissions are required to undergo the NSR permitting process.  *See also id.* §§ 7501(4), 7479(2)(C)(cross-referencing *id*. § 7411(a)(4)).  The exclusion, or more accurately EPA's interpretation thereof, historically provided that routine maintenance, repair, and replacement do not constitute changes triggering NSR.  The ERP both **defined and expanded** that exclusion. (Emphasis supplied).   EPA explained:

> [The] rule states categorically that the replacement of components with identical or functionally equivalent components that do not exceed 20% of the replacement value of the process unit and does not change its basic design parameters is not a change and is within the RMRR exclusion.

Equipment Replacement Provision of the Routine Maintenance, Repair and Replacement Exclusion, 68 Fed.Reg. 61,248, 61,270 (Oct. 27, 2003) ("Final Rule"); see also 70 Fed.Reg. 33,838 (June 10, 2005)("Reconsideration").

The Court said the ERP would allow sources (e.g., Alabama Power and TVA plants) to avoid NSR when replacing equipment under the twenty-percent cap notwithstanding a resulting increase in emissions. The Court stayed the effective date of the ERP on December 24, 2003, and vacated it in *NY II* as contrary to the plain language of section 111(a)(4) of the Act, 42 U.S.C. § 7411(a)(4).

IV.  Staying This Action

To tie all of this together, the Fourth Circuit rested its *Duke Energy* RMRR decision, as had the District Court before it, on the grounds that the same definition of "modification" should apply in both PSD and NSPS cases.  In *Alabama Power* and *NPCA*, I followed the reasoning and result of the *Duke Energy* trial and appellate court decisions.[8]

As noted earlier, the Supreme Court last week granted *certiorari* in *Duke*

---

[8]  My decision in *Alabama Power*, which *NPCA* then followed, was not grounded solely on *Duke Energy*.  For example, I said that, because of the various tacks EPA has taken on what constitutes a modification triggering permitting, EPA's interpretation of its regulations was not entitled to the deference accorded under *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("*Chevron*"), but would instead would be governed under the considerably less deferential standard set out in *U.S. v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292  (2001).  *See* footnote 6, *supra*.  It may be wishful thinking to predict (as I did in *Alabama Power*) what an appellate court might do, but I would be surprised if the parties' Supreme Court filings in *Duke Energy* do not discuss *Chevron* v. *Mead* deference in relation to whether the Fourth Circuit was, as the Petitioners assert, usurping the D.C. Circuit's role as the exclusive forum for challenging EPA regulations having national impact, the D.C. Circuit having exclusive subject matter jurisdiction to determine the validity of EPA regulations with nationwide applicability, 42 U.S.C. §7607(b), or whether the Fourth Circuit was striking down EPA's 1999 latest (and totally inconsistent with its prior interpretations ) interpretation of what constitutes a "modification" under the Act triggering the permitting provisions of the Act.  One reason I expect the issue to be discussed is that, as previously noted, the D.C. Circuit was well aware of the Fourth Circuit's "NSPS and NSR modification" definition ruling in *Duke Energy*.  It seems a long way around the elbow to the thumb for the Supreme Court to reverse *Duke Energy* when the D.C. Circuit, in *NY I*, could have said "*Duke Energy* is wrong, it's a nationwide regulation committed solely to us and *Duke Energy* is, for purposes of national analysis, void".  Or the Court in *NY I* could have gone ahead and decided the issue; it wouldn't have been the first time an appellate court has looked past the procedural default of a party when the reviewing court thought the issue sufficiently important to reach.  It may be that no one sought *certiorari* in *NY I*; that's hard to understand, given the large number of parties and interests affected by the decision.

*Energy* on these two (2) questions:

> 1. Whether the Fourth Circuit's decision violated Section 307(b) of the Act, which provides that national Clean Air Act regulations are subject to challenge "only" in the D.C. Circuit by petition for review filed within 60 days of their promulgation, and "shall not be subject to judicial review" in enforcement proceedings, 42 U.S.C. § 7607(b); and
>
> 2. Whether the Act's definition of "modification," which turns on whether there is an "increase" in emissions and which applies to both the NSPS and PSD programs, rendered unlawful EPA's longstanding regulatory test defining PSD "increases" by reference to actual, annual emissions.

*Duke Energy*, *supra*.

The first question may not have any applicability to this case, *Alabama Power*, and *NPCA*. I can't say that about the second question on which the Supreme Court granted *certiorari*; its resolution will have some impact on all my CAA cases, and the impact could be substantial. If the Supreme Court determines that different definitions apply to the NSPS and PSD provisions of the CAA, my rulings in *Alabama Power* and *NPCA* will be affected. Similarly, any decisions I may make as to the appropriate remedies in this action will almost certainly require me to first determine what compliance with the CAA entails, which in turn requires having to determine how emissions are measured. It's not that I don't understand the Court of Appeals in this action to have found violations. It's that the Court of Appeals left to me to determine the appropriate remedy. I believe the appropriate remedy is to require TVA's Colbert

Plant to come into compliance with the Act.  To do that, I necessarily have to determine what compliance consists of under the Act, including, but not necessarily limited to, how emissions are to be measured so that the Colbert Plant's emissions, after the remedial work, comply with the Act.  The Supreme Court's decision on the second *certiorari* question is bound to affect my analysis.  It seems to me to be a waste of judicial resources, and substantial amounts of the parties' time and money (all of which is ultimately borne by tax and rate payers) to attempt, at this point, to guess what the Court will decide.  It's hard enough to determine who's on what side: the United States, which **lost** *Duke Energy* in the Fourth Circuit, **opposed** the granting of *certiorari*.  2006 WL 575231.  And, noted earlier (footnote 8), no one sought *certiorari* in *NY I* which, as noted earlier, was fully aware of the Fourth Circuit's *Duke Energy* ruling on the PSD/NSPS "modification" definition issue, but chose not to express an opinion about it.  I read *NY I* to say the D.C. Circuit could have done so. If *Duke Energy* wrongfully usurped the D.C. Circuit's sole reviewing authority here, why didn't the D.C. Circuit say so?  Seeking *certiorari* would have permitted the Supreme Court to review both *NY I* and *Duke Energy* (together if it wanted to) and sort out these issues, which have been litigated almost continuously for decades in various

14

modification cases brought as citizen suits or as EPA enforcement actions.[9]

I note, too, that NPCA and Our Children's Earth Foundation (which in 2004 unsuccessfully sought to intervene in this action, doc. 230) jointly filed an *amicus* Brief in support of the *Duke Energy* Petitioners, 2006 WL 615814 (3/8/06), saying in part:

> As part of its activities, NPCA is a plaintiff in two Clean Air Act citizen suits against the Tennessee Valley Authority alleging the same type of violations at issue in this case. *Nat'l Parks v. TVA*, Case No. 05-6329 (6th Cir.) (pending) and *National Parks Conservation v. TVA*, No. 06-10729-J (11th Cir.) (pending) [sic]. NPCA contends that these alleged violations (from TVA plants located in Alabama and Tennessee) cause hundreds of tons of needless pollution annually and are having a significant adverse impact on protected federal lands, including Great Smoky Mountains National Park.

Writing in *NPCA* before it was appealed, I indicated my intention to consolidate it with this action when this action returned from the Court of Appeals. The reasons were practical: both actions involved TVA's Colbert County plant. It didn't make any sense to me to proceed on two different tracks with respect to CAA violations (whatever they may ultimately be) at the same plant. Assuming TVA's Colbert Plant's operations during the relevant periods were in violation of the Act, and the Eleventh Circuit minced no words in expressing its opinion that they were, the Eleventh

---

[9] Of course I could be wrong about the seeking of, or denial or, *certiorari* in *NY I*. *NY II* is another matter: a petition for rehearing was filed by EPA on May 1, 2006 and, as of this writing, is still under advisement by the Court.

Circuit's decision in *NPCA*, or the Supreme Court's decision in *Duke Energy*, or both, could substantially affect the relief I order.  Since the relief will cost millions, perhaps hundreds of millions, of dollars (and this is pure speculation on my part), it doesn't make sense to start the remediation/compliance process only to find out in a year or so that my analysis has not been fully informed or is just plain wrong. In either event, resources would be wasted and the ultimate goal of all the litigants, which I assume to be compliance with the Act, would be delayed, not hastened, since any ruling I make will be appealed.

Judicial economy and commonality of issues are not the only similarities between this action and *Duke Energy*; George Hays and Michael Costa represent NPCA and Our Children's Earth Foundation on the amicus brief in *Duke Energy*; Messrs. Hays and Costa represent the Plaintiffs in *NPCA*; Mr. Hays represents the Plaintiff here.  Similarly, Reed Zars and Bart Slawson appear as counsel in at least two of my CAA actions.

## V.  Summary

For the reasons discussed above, an Order will be entered staying this action until there is a decision in *Duke Energy*, or until the parties, jointly and for good cause shown, move for a dissolution of the stay.  Further, a separate Order of Mediation will issue.

**DONE** and **ORDERED** this the 23rd day of May, 2006.

**VIRGINIA EMERSON HOPKINS**
United States District Judge