# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHWESTERN DIVISION

| | |
|---|---|
| **SIERRA CLUB and ALABAMA ENVIRONMENTAL COUNCIL, INC.,** ) ) ) ) | |
| **Plaintiffs** ) ) | |
| v. ) ) | No. CV-02-2279-VEH |
| **TENNESSEE VALLEY AUTHORITY,** ) ) ) | |
| **Defendant** ) | |

## MEMORANDUM OPINION ON SIERRA CLUB MOTION TO RECONSIDER STAY AND REFERRAL TO MEDIATION

### I. Background and Current Posture

This is a civil action filed by the Plaintiffs Sierra Club and Alabama Environmental Council, Inc. ("AEC")[1] against the Defendant Tennessee Valley Authority ("TVA") for declaratory and injunctive relief and the imposition of civil penalties under the Clean Air Act, 42 U.S.C. §§ 7401-7671q ("CAA", "the Act"). The action also sought an order penalizing and enjoining TVA's excessive emission of harmful air pollutants from the TVA Fossil Plant in Tuscumbia, Colbert County, Alabama ("Colbert Plant") in violation of the CAA, the Alabama State

---

[1] Unless the context indicates otherwise, plaintiffs will collectively be referred to as "Sierra Club".

Implementation Plan ("SIP"), 40 C.F.R. § 52.69 *et seq.* and previously at 40 C.F.R. § 52.50 *et seq.*, and the TVA Colbert Plant's Air Permits, 701-0010-Z009; 701-0010-Z013.  The Complaint alleged a Count of violation of the CAA each time the Colbert plant's exceeded the twenty per cent opacity limits on the Colbert plant's emissions.

In *Sierra Club v. TVA*, 430 F.3d 1337 (11th Cir. 2005) (doc. 90), the Court of Appeals affirmed the use of continuous opacity monitoring system ("COMS") as credible evidence of opacity violations, reversed my ruling that the Alabama Department of Environmental Management's ("ADEM") use of the "2% de minimis" rule[2] was a permissible interpretation of the CAA, and affirmed Judge Johnson's ruling that TVA was immune from civil penalties under the CAA .  The action was remanded to me for proceedings consistent with the Court's opinion.

The parties dispute how many opacity violations would be proven using COMS data.  I will have more to say about opacity violations later, but for purposes of this opinion suffice it to say that, in the words of the Court of Appeals, there should be "plenty".

By Orders entered May 23, 2006 (docs. 111, 112, & 113), I stayed this action, ordered the parties into mediation, and denied all outstanding motions as moot, granting the parties leave to seek permission to file new and updated motions should

---

[2]  Ala. Admin. Code r. 335-3-4-.01(4).

I lift the stay. The motions pending on May 23 were the parties' 2003 motions for summary judgment pending at the time the case was appealed to the Eleventh Circuit, and motions to strike various evidentiary filings and declarations in connection with Sierra Club's renewed Motion for Summary Judgment (which incorporated its 2003 motion).

The Order Referring Action To Mediation ("Mediation Order") directed the parties to notify the court's courtroom deputy, on or before June 9, 2006, of the mediator selected and the time, date and place of the initial mediation sessions. (Doc. 112).

On May 26, 2006, Sierra Club moved for reconsideration of the Mediation Order (doc. 112) and the Stay Order (doc. 111). (Doc. 114). On May 30, 2006, I issued my standard motion response Order giving TVA eleven (11) days to respond to Sierra Club's motion to reconsider. TVA filed its response on June 12, 2006. (Doc. 115). Sierra Club filed a Reply on June 14, 2006.

In this Opinion, I review Sierra Club's Motion to Reconsider, TVA's Response, and the issues I see arising, directly and indirectly. While I have no love for reconsideration motions and ultimately deny Sierra Club relief, the pleadings and my review of the file convince me that further explanation of my views on the current status of the action and its resolution may assist the parties in reaching a resolution.

If not, they can better prepare for trial.

## II. The Mediation Order; Rule To Show Cause

Apparently lost on the parties in the latest round of pleadings is that no one obeyed that part of the Mediation Order requiring the naming of a mediator and the furnishing of the information about the initial mediation session by June 9, 2006. Perhaps Sierra Club believed that the filing of a Motion For Reconsideration automatically stays the effect of an Order; it does not. Perhaps Sierra Club and TVA believed that my May 30 standard motion response Order modified the Mediation Order because it permitted TVA's Response to be filed after June 9, 2006; the May 30 Order said nothing about the June 9, 2006 deadline. By Order entered separately, I am directing the parties to either provide the information required by the Mediation Order to my courtroom deputy, in a joint filing signed by counsel for all parties, by 4:00 p.m. Thursday, July 13, 2006, or to appear before me at 4:00 p.m. Friday, July 14, 2006, to show cause, if they can, why they should not be held in contempt for their failure to abide by the applicable terms of the Mediation Order.

## III. Sierra Club's Motion To Reconsider; TVA's Response

A.   Sierra Club seeks reconsideration because it says (further) mediation will

be futile[3]; because the pendency of the *Duke Energy*[4] appeal does not warrant a stay; seeks leave to file an updated motion for summary judgment; and, in the alternative, if I don't reconsider and withdraw the Mediation and Stay Orders, requests me to certify, pursuant to 28 U.S.C. § 1292(b), an interlocutory appeal addressing the rulings in those Orders. (Doc. 114)

  B. TVA's response says that the parties have yet to mediate in person as required by this District's ADR plan (a point that Sierra Club's response does not contest) and that Sierra Club has failed, as a matter of law, to establish good cause for vacating the Mediation Order.

  C. TVA says I should not reconsider the stay Order because it would be moot if the mediation were successful, and, should the mediation fail, I was correct when I said that the Supreme Court's decision in *Duke Energy* is likely to be binding or informative. (Doc. 113, emphasis in original).

  D. TVA says I should deny Sierra Club's request to file an immediate, updated motion for summary judgment.

---

[3] Sierra Club says there have been two (2) appellate telephone mediations between the parties, and neither was successful. One of those mediations was conducted through the Eleventh Circuit during the appeal of this action, the second by the Sixth Circuit (05-6329) during an appeal that is still pending.

[4] *U.S. v. Duke Energy*, 411 F.3d 539 (4th Cir. 2005), *certiorari granted by Environmental Defense v. Duke Energy Corp.*, ____ S.Ct. ____, 2006 WL 1310699, 74 USLW 3407 (U.S. May 15, 2006) (No. 05-848).

  E. TVA says interlocutory appeal would not be appropriate under the instant facts and law.

I discuss each contention, although not in the exact order above.

## IV. Discussion

  1. The Mediation Order - I have little doubt that the Mediation Order was well within my discretion and it would be inappropriate to certify that Order. *E.g., Abele v. Hernando County*, 161 Fed.Appx. 809 (11th Cir. 2005).

  2. Interlocutory Appeal - I believe this is the worst thing I could do. First of all, the Orders in docs. 111 and 112 are not, in my view, appropriate 28 U.S.C. § 1292(b) Orders. The Mediation Order is clearly discretionary, and the question of whether *Duke Energy* warrants a stay of this action is not a controlling question of law, it's a question of timing. Sierra Club misses the mark on timing for a number of reasons. First, the stay is not indefinite; at this point it's less than a year at most, i.e., the end of the Supreme Court's October, 2006 term. Second, there is no guarantee that the Eleventh Circuit would accept the 28 U.S.C. § 1292(b) appeal and, even if it did, that it would resolve such appeal any faster than the Supreme Court will resolve *Duke Energy*. Finally, if the Court of Appeals took the appeal and ordered me to lift the stay based on *Duke Energy*, that would still leave the stay based on mediation in full force and effect, another reason I doubt the Eleventh Circuit would

agree to hear a 28 U.S.C. § 1292(b) appeal of the Mediation and Stay Orders. In short, certifying either of both of the Orders would reactivate the war of pleadings the parties have waged since 2003 instead of making them sit down face to face and see if they can use their powers of persuasion and advocacy to settle, rather than prolong, this litigation.

3.   The effect of *Duke Energy* - While I continue to believe *Duke Energy* is likely to affect the operations of TVA's Colbert Plant, I also think, after further consideration, that Sierra Club is probably correct when it says that *Duke Energy* is unlikely to be dispositive of this action, and that the facts of this action are sufficiently different from *Duke Energy's* that any impact will be limited. *Duke Energy* is most likely to affect Colbert Unit 5, which is the subject of a related CAA (modification without proper permitting) case involving these parties, *National Parks Conservation Association & Sierra Club v. TVA*, cv-01-403-VEH (the "*NPCA*" action), currently on appeal to the Eleventh Circuit. *Duke Energy* is less likely to affect Colbert Units 1 - 4, which are not involved in the *NPCA* action.

It is certainly possible that the Supreme Court will decide only the first question on which *certiorari* was granted, i.e., whether the Fourth Circuit's decision in *Duke Energy* invalidated the 1980 Prevention of Significant Deterioration ("PSD") regulations in violation of 42 U.S.C. § 7607(b), which reserves challenges to CAA

regulations having nationwide impact to the D.C. Circuit exclusively. I expressed my views about this issue most recently in the Mediation Order, noting, *inter alia*, that the D.C. Circuit was aware of, cited to, and declined to express an opinion on, the key regulatory issue decided by the Fourth Circuit in *Duke Energy*, which was whether the definition of "modification" was the same in both the CAA's New Source Performance Standards ("NSPS"), 42 U.S.C. §§ 7411, 7411(a) and the Prevention of Significant Deterioration ("PSD"), provisions, 42 U.S.C. §§ 7470 - 7492. *NY v. EPA I*, 413 F.3D 3, 19 - 20.[5]

And Sierra Club should temper any enthusiasm about *Duke Energy's* potential outcome with the thought that getting what you wish for can be problematic: even should the Supreme Court vacate the Fourth Circuit's opinion, it is speculation to say that doing so would somehow limit the Eleventh Circuit's power over the ultimate resolution of this action, particularly with respect to any injunctive relief Sierra Club may, or may not, be awarded. And it would be even more speculative to suggest that, should Sierra Club be unhappy with the ultimate litigation outcome here, the Supreme Court would grant *certiorari* and overturn that outcome.

It is axiomatic that how the Supreme Court frames the issues(s) will in no small

---

[5] PSD review of new and modified sources is called "New Source Review", or "NSR", *NY v. EPA I*, 413 F.3d at 12 -13.

part determine the *Duke Energy* analysis, and therefore the outcome.  I stand by my *Alabama Power* observations that, regardless of what the law is (or may be by the time *Duke Energy* permeates down to me) it is singularly unwise, under any standard of administrative deference, to say grace over the retroactive agency interpretation of regulations affecting a huge, nationally regulated industry where the new interpretation will result in the expenditures, collectively, of billions of dollars trying to retrofit work that wasn't designed to meet the standards now being imposed.  It may be, how do I say it, expedient from a regulatory point of view, but I view *Mead* in part as the judiciary's response to the "that was then, this is now" approach to such regulation.  I do not see how anyone can say with a straight face that EPA's 1999 interpretation of RMRR and emissions, as set out in *Alabama Power* and the other 1999 EPA enforcement actions, one being *Duke Energy*, was the same interpretation as ADEM's published SIP regulations.[6]  Even if the example given is inaccurate (the Alabama Administrative Code does not tell me how long 335-3-1.02(mm)2.(I) - (ii) has been in effect), there is more than sufficient documentation in the filed exhibits that leads one to conclude that, under the 1999 enforcement theory, EPA deliberately failed to enforce the Act for almost two (2) decades, with all the state environmental

---

[6] *See, e.g.*, Ala. Admin. Code r. 335-3-1.02(mm)2.(I) - (ii) (changes in production rate or an increase in the hours of operation shall not be considered a change in the method of operation as set out in the definition of "modification" found at Ala. Admin. Code r. 335-3-1.02(oo)).

agencies and national environmental groups standing idly by while the industry spent billions on "life extension" projects that EPA and the state attorneys general now say were modifications that required permitting. *NPCA* is a good example; TVA's intention to spend hundreds of millions of dollars on Colbert 5 was widely reported in the media, and well known to EPA, ADEM, Sierra Club, *et al*. Twenty (20) years passed before Sierra Club attacked the work as a violation of the Act. If the plaintiffs' positions in *NPCA* and *Alabama Power* are examples of how the CAA is supposed to work, all I can say is that it's a heck of a way to run a railroad.[7]

    4.    New/"Updated" Motions for Summary Judgment - I believe the parties, if they want to, can successfully resolve this action, in mediation or independent of mediation. Having said that, I have no wish to further delay my role in the resolution of this action. I believe another round of summary judgment motions will do just that.

In order to explain the basis for my belief, I first have to modify something I have said previously, which is that all that remains before me in this action is the

---

[7] I say this with some awareness that the United States, the various state attorneys general and *amici* in the remaining 1999 enforcement actions, e.g. *U.S. v. Cinergy*, 384 F.Supp2d 1272 (S.D. Ind. 2005), Case No. 06-1224 (argued June 2, 2006, 7th Cir.) and Petitioner and its *amici* in *Duke Energy*, *supra*, strongly disagree with my assessment of the 1999 enforcement actions as set out in *Alabama Power*, *NPCA*, and here, as well as my analysis in those actions of how emissions are to be measured, and what constitutes routine maintenance, replacement and repair ("RMRR"), under the CAA.

question of remedies. The Court of Appeals was clear: the COMS data constitute "credible evidence" of violations of the 20% opacity provisions of TVA's permit. What I have in effect said since, which is broader than what the Court of Appeals said, is that opacity violations, standing alone, mean that TVA has violated the Act, and what's left for trial is appropriate injunctive relief. That may be the ultimate outcome, but further review of Eleventh Circuit jurisprudence, the Alabama State Implementation Plan ("SIP") regulations, and TVA's Colbert permit, leads me to modify my assertion as follows: the COMS data are credible evidence of violations of the 20% opacity provisions of TVA's CAA permit, and therefore make out a *prima facie* violation of the Act.

The reasons that the 20% opacity violations do not, standing alone, end the liability inquiry, can be seen in *Sierra Club v. Georgia Power Co.*, 443 F.3rd 1346 (11th Cir. 2006) ("*Georgia Power*"), decided March 30, 2006. There, the District Court, in a case arising from Georgia Power's Wansley's coal-fired electricity generating plant[8], did what Sierra Club urges me to do now: using COMS data that showed opacity limitation violations, the court granted partial summary judgment on Counts One and Two against Georgia Power, holding that the COMS data showed violations of the Georgia State Implementation Plan ("SIP") and Georgia Power's

---

[8] Colbert is a coal-fired electricity generating plant.

permit for the Wansley plant . Georgia Power, like TVA here, did not dispute the COMS data, but did contend that the emissions exceedances were not CAA violations because all of them occurred during periods of startup, shutdown, or malfunction ("SSM"). The permit and the Georgia SIP allowed opacity to exceed the (40%) limitation during SSM. The district court concluded that even if the violations occurred during SSM, Georgia Power could not raise an SSM defense. Because Georgia Power conceded that the exceedances took place, the district court's rejection of Georgia Power's ability to raise SSM defenses led the court to grant partial summary in Sierra Club's favor. *Georgia Power*, 443 F.3d 1346, 1352. The district court, at Georgia Power's request, certified its ruling for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

The Court of Appeals granted Georgia Power's petition for leave to appeal the partial summary judgment order and reversed. In doing so, the Court rejected various Sierra Club arguments (Georgia's SSM rule was broader than EPA 1999 SSM Guidance; the SSM defense only applied to government, not citizen suit, enforcement actions, and SSM applicability was a matter of discretion with the Georgia Environmental Protection Division[9]) and held that, on remand, Georgia Power should be allowed to raise an SSM affirmative defense to the exceedances alleged by Sierra

---

[9] Georgia's ADEM.

Club. The Court further held that the burden was on Georgia Power to prove, as to all such exceedances, that each met the criteria set forth in Georgia's SSM Rule and the Wansley Plant's SSM condition. *Id.* at 1357.

There are two sets of TVA Colbert Plant CAA Permits before me. The first was issued in 1991, the second in 1998. Sierra Club Motion for Summary Judgment, Exhibit 6., TVA Motion for Summary Judgment, Exhibit 6. Based on the Court of Appeals opinion here, the second set of permits, Permit No. 7-1-0010-Z009 - 13, covering Colbert Units 1 - 5 respectively ("the Colbert permit"), applies since COMS data were not credible evidence until after 1998.

Section 7.a. of the Colbert permit prohibits average and maximum excess emissions over 20% computed from six-minute averages. Section 9. provides exceptions to the opacity requirements: startup (9.a.), shutdown (9.b.), and load change (9.c.).[10]

There are other, potentially applicable, Alabama SIP provisions that TVA could seek to raise in defense of the opacity violations. Ala. Admin. Code r. 335-3-4-.01, Visible Emissions, sets forth at (1)(a) the 20% opacity standard, provides in (1)(b) for a 40% opacity discharge "[d]uring one six (6) minute period in any sixty

---

[10] "Shutdown" and "Startup" are defined terms, AL Admin. Code r. 335-3-1.02(lll), (ttt); "load change" is not.

(60) minute period"[11], sets forth at (1)(c) the startup, shutdown, load change, "and rate change or other short, intermittent periods of time upon terms approved by the Director and made part of such permit", and, at (1)(d), allows ADEM's director to approve other exceptions in accordance with the provisions of (d) 1. - 5.[12]

The above discussion, like *Georgia Power*, suggest that, as part of its affirmative defense to the opacity violations, i.e., as a way of proving that such violations do not violate TVA's (Title V) permit, the Alabama SIP, and the CAA, TVA may choose to offer evidence as to the opacity violation(s). Should TVA decide to do so I strongly suggest that the parties explore the facts as to proof in detail during mediation if for no other reason than that, should mediation fail, I will require a very detailed and succinct summary of the opacity violations and which ones are, and are not, subject to any such defense(s). Put another way, I do not intend to hear lengthy testimony about matters that reasonable people can stipulate to, and I expect the parties to be reasonable.[13] And, to assist the parties in their efforts to be reasonable,

---

[11] Which is <u>not</u> the same as saying, as TVA does, that ". . . Alabama law permits plumes of up to 40% opacity for over two hours every day". TVA Brief In Opposition to Plaintiffs' Renewed Motion For Summary Judgment. (Doc. 93 at 20).

[12] Ala. Admin. Code r. 335-3-4-.01 also contains, at (4), the 2 % "de minimis" standard rejected by the Court of Appeals.

[13] I am aware that such a "case by case" defense of the opacity violations would contradict TVA's writing to Sierra Club that "TVA does not intend to undertake such a one-by-one examination of the appropriate exemption classification of each alleged violation and does not intend to present such one-by-one evidence to the Court in defense of the Plaintiffs' claim for

I do not accept TVA's interpretation of Ala. Admin. Code r. 335-3-4.01(1)(b) "six minutes in any sixty (60) minute period" opacity exceedance. I count sixty minutes from the time of the first violation; if ADEM and EPA had meant to say "every hour", the regulation would say "every hour". Thus, in the case of an opacity exceedance fifty-nine (59) minutes after another exceedance, the second exceedance would be an opacity violation.

Further, I have substantial reservations that, as TVA asserts, an opacity violation does not "count" unless and until that violation is reconciled with or adjusted to the older Method 9 methodology. The Court of Appeals didn't say this, and the literal language of the credible evidence rule does not require it. Ala. Admin. Code r. 335-3-1.-.13. TVA is free to argue that I should not rely on the COMS data, standing alone or otherwise, to support a finding that Sierra Club has carried its burden of proof to show CAA violations; the evidence proffered will ultimately

---

injunctive relief." June 6, 2003 letter from Lancaster to Moore, Exhibit 21, Volume II to Plaintiffs' Exhibits in Support of Motion for Summary Judgment. (Doc. 25). That letter was written two (2) years before the initial Eleventh Circuit decision in this action and nearly three (3) years before the Court's *Georgia Power* decision. I consider those decisions, taken together, as sufficiently changing the legal landscape that, should mediation fail, I would permit TVA to undertake such a one-by-one defense, should it be so advised, and subject to the limitations set forth above, i.e., that I will not permit either party to offer "dueling experts" on any/each such opacity violation. If the parties are unreasonable and cannot stipulate as set out above, I will use a Special Master or appoint an independent expert as the court's witness to accomplish this task, and I will assess the costs thereof proportionately against the party(ies) I find to have been unreasonable.

control my decision. TVA is free to preserve for the record its argument that the COMS data must be reconciled or adjusted to Method 9 methodology; I reject that argument.

Having said this, I also advise the parties, particularly the Plaintiffs, that proving the opacity violations may not, as they requested in their motion for summary judgment, automatically lead to an Order directing TVA to submit a plan to correct those violations and prevent their recurrence. That may happen, but TVA, as it requests in its Brief in Opposition to Plaintiffs Renewed Motion For Summary Judgment (doc. 93), is entitled to a hearing where the court will hear, **briefly and succinctly**, evidence on the various factors affecting the issuance and content of any injunction herein.

Finally, I am constrained from suggesting the person(s) the parties may select as their mediator but cannot refrain from observing that, given the technical subject matter involved, it would make a lot of sense to select a mediator who, in addition to possessing substantial mediation skills and experience, "gets it" when it comes to the technical and engineering issues.

A separate Order will issue.

**ENTERED** this the 5th day of July, 2006.

_____
**VIRGINIA EMERSON HOPKINS**
United States District Judge