FILED
2007 Aug-27  AM 07:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| SIERRA CLUB and ALABAMA ENVIRONMENTAL COUNCIL, INC., | ) ) ) ) | |
| **Plaintiffs** | ) ) | |
| v. | ) ) | **Case No. 3:02-cv-2279-VEH** |
| TENNESSEE VALLEY AUTHORITY, | ) ) ) | |
| **Defendant** | ) | |

## MEMORANDUM OPINION ON PLAINTIFFS'
## THIRD MOTION FOR SUMMARY JUDGMENT ON LIABILITY

## I.  INTRODUCTION

This matter comes before the Court on Sierra Club's and Alabama Environmental Council's Third Motion for Summary Judgment on Liability, filed April 5, 2007 ("the motion"; "summary judgment motion"; "Sierra Club's motion"). (# 132).  Memorandum and evidentiary submissions in support of the motion were also filed April 5, 2007.  (# 133).  Tennessee Valley Authority's Response in Opposition and Evidentiary Materials Filed In Support of its opposition to the motion ("TVA's evidentiary materials") were filed May 7, 2007.  (#'s 140 - 142).  A Reply Brief was filed May 18, 2007.  (# 145).

## II. **BACKGROUND**

In 2002, the Sierra Club and the Alabama Environmental Council (collectively "Sierra Club") sued the Tennessee Valley Authority ("TVA") under the Clean Air Act, 42 U.S.C. §§ 7401-7671q, ("the Act"; "CAA";) claiming that TVA's plant in Colbert County, Alabama ("the Colbert plant"; "Colbert") violated Alabama's State Implementation Plan ("SIP") approved by the U.S. Environmental Protection Agency. ("EPA"). *See* 40 C.F.R. § 52.69, *et seq.* and previously at 40 C.F.R. § 52.50 *et seq.* Sierra Club claims TVA repeatedly violated the SIP's 20% opacity limitation, Ala. Admin. Code r. 335-3-4-.01(1)(a), and the Colbert Plant's Air Permit, 701-0010-Z009 through 701-0010-Z013. The Complaint alleged a violation of the CAA each time the Colbert plant exceeded the legal "opacity" limits on emissions. Initially, there were said to be more than 8,900 violations during the five-year period from 1997 to 2002 when the Complaint was filed. Sierra Club sought an order enjoining TVA's excessive emission of harmful air pollutants from the Colbert Plant, and the imposition of civil penalties.

In September, 2004, the court granted summary judgment to TVA on all claims for two reasons. (# 83). The first reason, which covered all claims made by Sierra Club, was that all the claimed violations at the Colbert Plant were within the forgiveness zone, or safe harbor, of the Alabama Department of Environmental

2

Management (ADEM)'s so-called "2% *de minimis* rule." The court held that it should defer to Alabama's regulation, Ala. Admin. Code r. 335-3-4-.01(4), and the manner in which ADEM, the regulating agency, interpreted the Alabama SIP. The second reason was that data generated by the Colbert plant's continuous opacity monitoring system ("COMS") could not be used to establish opacity violations that occurred before May 20, 1999, the date ADEM adopted its "credible evidence rule," Ala. Admin. Code r. 335-3-1-.13(2). Previously, on February 20, 2003, Judge Johnson had held that sovereign immunity principles would bar the assessment of civil penalties against TVA. (# 13).

Sierra Club timely appealed. In *Sierra Club v. TVA*, 430 F.3d 1337 (11th Cir. 2005) (# 90) ("*Sierra Club*"), the Eleventh Circuit:

1)     affirmed this court's decision on the application of the "credible evidence" rule to this action (# 83);

2)     reversed this court's ruling that ADEM's use of the "2% *de minimis*" rule was a permissible interpretation of the Clean Air Act, holding instead that ADEM's use of the 2% de minimis rule throughout the period in question was an illegal, unilateral modification of the Alabama SIP, 42 U.S.C. § 7410(I); 40 C.F.R. § 51.105, and that Alabama's interpretation of its state implementation plan (SIP) cannot change the Act's mandate of continuous compliance. Clean Air Act, §§ 110, 302(k), 42 U.S.C. §§ 7410, 7602(k);

3)     affirmed Judge Johnson's ruling that the Tennessee Valley Authority ("TVA") was immune from civil penalties under the Act, (# 13), and

4)     remanded the action for proceedings consistent with the Court's opinion.

On remand, this court initially stayed the action to await the Supreme Court's decision in *Environmental Defense v. Duke Energy Corp.*, ___ U.S. ___, 127 S.Ct. 1423, 167 L.Ed.2d 295 (2007) ("*Duke Energy*"); the District of Columbia Circuit's decision in *New York v. E.P.A.*, 443 F.3d 880 (D.C. Cir. 2006), *rehearing en banc denied* June 30, 2006 (Case No. 03-1380) ("*New York II*"), and the appeals of this court's decisions in *National Parks Conservation, Inc. and Sierra Club v. Tennessee Valley Authority* (a case involving construction work at Colbert 5 in the early 1980's), 413 F.Supp. 2d 1286 (N.D. Ala. 2006) CV-01-403-VEH ("*NPCA*"), and *United States v. Alabama Power Co.*, 372 F.Supp. 2d 1283 (N.D. Ala. 2005), CV-01-152-VEH (*"Alabama Power"*).  Both *NPCA* and *Alabama Power* were appealed to the Eleventh Circuit; *NPCA* remains pending, while the Eleventh Circuit granted leave to the parties in *Alabama Power*, if they chose, to apply for Rule 60(b) relief to this court in light of *Duke Energy, supra.*[1]

For reasons previously stated, #150, the stay has been lifted, and Sierra Club's motion is before the court for decision.  The time period covering the claimed violations is January 3, 2000, to September 30, 2002.

---

[1] The United States has done so.  CV-01-152, #184, filed July 23, 2007.

### III.  THE CLEAN AIR ACT

The Clean Air Act is codified at 42 U.S.C. §§ 7401-7671 (2000).   The implementing regulations are found at 40 C.F.R., pts. 50-99.  The original Act and the amending legislation can be found, respectively, at Clean Air Act Amendments of 1970, Pub. L. No. 91-604, 84 Stat. 1676 (1970); Clean Air Act Amendments of 1977, Pub. L. 95-95, 91 Stat. 685 (1977); Clean Air Act Amendments of 1990, Pub. L. No. 101-549, 108 Stat. 2399 (1990).

For the reader unfamiliar with prior opinions discussing the Act, the following is an overview of the Clean Air Act's scheme of joint state and federal implementation involving State Implementation Plans, permits issued under Title V of the Act, and citizen's enforcement suits.

### 1.  State Implementation Plans ("SIPs")

The Clean Air Act strives "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  42 U.S.C. § 7401(b)(1).   The Clean Air Act sets out a two-stage process for achieving this goal.    In the first stage, EPA sets "national ambient air quality standards" for various pollutants.  42 U.S.C. § 7409.    In the second stage, each state creates and implements a plan, known as a "State Implementation Plan" or "SIP," to ensure its air meets the EPA standards.  *See* 42

U.S.C. § 7410.

Before implementing its plan, each state must submit a proposed SIP to the EPA for approval.  42 U.S.C. § 7410(a)(1).   To gain EPA approval, the SIP must "include enforceable emission limitations and other control measures, means, or techniques ... as may be necessary or appropriate to meet the applicable [Clean Air Act] requirements."  42 U.S.C. § 7410(a)(2).   Each state's SIP must "assure that national ambient air quality standards are achieved."[2]  42 U.S.C. § 7410(a)(2)(c).

Each state must revise its SIP periodically to account for new EPA standards and new emissions reduction technologies.  42 U.S.C. § 7410(a)(2)(H).  Like an entirely new SIP, any SIP revisions must be open to public hearing and comment and must be approved by the EPA.  42 U.S.C. § 7410(a)(1).  The EPA may also make what is known as a "SIP call," notifying a state of inadequacies in its current SIP and requesting that the state submit a revised plan.  *See* 42 U.S.C. § 7410(k)(5).

## 2.  The Title V Permit

In 1990, Congress amended the Clean Air Act to add Title V, *see* 42 U.S.C. §§ 7661-7661f, to assist in compliance and enforcement of air pollution controls.  Clean Air Act Amendments of 1990, Pub.L. No. 101-549, §§ 501-507, 104 Stat. 2399, 2635-48 (1990).  "Under Title V, major stationary sources of air pollution are

---

[2]  Alabama's SIP is found at <u>Ala. Admin. Code</u> §§ 335-3-1-.01 - 336-3-1-.16.

required to obtain an operating permit, which establishes the [Clean Air Act] requirements for, among other things, emission limitations relevant to the particular polluting source." *Legal Envtl. Assistance Found., Inc. v. EPA,* 400 F.3d 1278, 1279 (11th Cir.2005).

The intent of Title V is to consolidate into a single document (the operating permit) all of the clean air requirements applicable to a particular source of air pollution.   The Title V permit program generally does not impose new substantive air quality control requirements.   Rather, a Title V permit "enable[s] the source, States, EPA, and the public to understand better the requirements to which the source is subject, and whether the source is meeting those requirements." Operating Permit Program, 57 Fed.Reg. 32,250, 32,251 (July 21, 1992) (codified at 40 C.F.R. § 70).

Title V authorizes each state to design its own stationary source permitting program and to submit that program to the EPA for approval.  42 U.S.C. § 7661a. When the state agency, here ADEM, issues a Title V permit, the terms of the permit must comply with Alabama's EPA-approved SIP.   *See* 40 C.F.R. § 70 (setting minimum requirements for state operating permit programs and standards for state-issued permits).

Each permit approved and issued by ADEM must also be submitted to EPA for review.  *See* 42 U.S.C. § 7661d(b); *see generally N.Y. Pub. Interest Research Group,*

*Inc. v. Johnson,* 427 F.3d 172, 176 (2d Cir.2005).  The EPA may object to the permit and send it back to ADEM to correct the problem perceived by the EPA.  *Id.* at 176. If the EPA declines to object to the submitted permit within 45 days, "any person" may petition the EPA requesting that the agency object.  *Id.*  EPA "shall ... object" to the permit if the petition demonstrates that the permit does not comply with the Clean Air Act.  *Johnson,* 427 F.3d at 176.  The EPA's denial of a petition to object to a Title V permit is subject to judicial review.  *Id.; see also* 42 U.S.C. § 7607(b) (granting jurisdiction to the United States Court of Appeals for the District of Columbia to review a variety of EPA decisions taken under the Clean Air Act).  *See Sierra Club v. Georgia Power*, 443 F.3d 1346, 1348 - 50 (11th Cir. 2006).

### 3.  Citizen Enforcement Suits

The Act gives "any person" the authority to bring a civil action on his or her own behalf "against any person ... who is alleged to have violated ... an emission standard or limitation under this chapter."  42 U.S.C. § 7604(a)(1).  "An emission standard or limitation" is defined to include "any other standard, limitation, or schedule established under any permit issued pursuant to [Title V] or under any applicable State implementation plan approved by the [EPA] Administrator."  42 U.S.C. § 7604(f)(4).  Accordingly, citizens may sue to enforce the terms of a stationary source's Title V permit.

" '[T]he citizen suit is meant to supplement rather than to supplant governmental action.' " *Am. Canoe Ass'n, Inc. v. City of Attalla,* 363 F.3d 1085, 1089 n. 5 (11th Cir.2004) (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 60, 108 S.Ct. 376, 383, 98 L.Ed.2d 306 (1987)). As such, prior to initiating litigation, a citizen enforcer must notify the EPA, the alleged violator, and the relevant state agency of the citizen's intent to sue. 42 U.S.C. § 7604(b). The citizen enforcer may not sue until sixty days after sending the notice letters, and his lawsuit is barred if "the [EPA] Administrator or State has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standard, limitation, or order." 42 U.S.C. § 7604(b)(1)(B). It is undisputed that Sierra Club has fulfilled its notice obligations under the Act.

## IV. UNDISPUTED FACTS FROM THE MOTION PLEADINGS[3]

A.    The following undisputed facts ("UF") are drawn from Sierra Club's initial brief and TVA's response in opposition, using the same numbering as

---

[3] Where **material facts** are disputed, TVA's version is accepted. Having said that, a number of TVA's UF's contain legal argument, or are irrelevant to the motion because they do not constitute a defense to opacity readings that exceed 20% or 25%. The Undisputed Facts set out in this section are sufficient to support the result reached.

contained in Sierra Club's brief.[4]

**1**.     Plaintiff Alabama Environmental Council, Inc. ("AEC") is a non-profit Alabama corporation and therefore a "person" under 42 U.S.C. § 7604(a).

**2**.     Plaintiff Sierra Club is a non-profit California corporation, and therefore a "person" under 42 U.S.C. § 7604(a).

**3**.     Defendant Tennessee Valley Authority ("TVA") is a corporate agency and/or instrumentality of the United States and therefore a "person" under 42 U.S.C. § 7604(a).

**4**.     Pursuant to the 60-day citizen suit notice provision in the Clean Air Act ("CAA"), 42 U.S.C. § 7604(b)(1)(a), plaintiffs notified the EPA, the Alabama Department of Environmental Management ("ADEM") and TVA on July 10, 2002 of opacity violations at TVA's Colbert Plant and plaintiffs' intent to sue.

**5**.     Plaintiffs filed a complaint on September 16, 2002, more than 60 days from the date of the notice letter.

**6**.     Defendant TVA answered that complaint on November 15, 2002, admitting receipt of the notice letter and that the complaint was filed more than 60 days thereafter, and that neither ADEM nor EPA had brought suit against TVA for the same violations.

**7**.     Plaintiffs Sierra Club and AEC have standing to prosecute this action. *Sierra Club v. TVA*, 430 F.3d 1337, 1344-45 (11th Cir. 2005).

**8**.     TVA is the owner and operator of the Colbert Fossil Plant ("Colbert"), which is located at 900 Steam Plant Road, Tuscumbia, Alabama 35674-6906.

**9**.     Colbert is a fossil fuel-fired electricity generating facility that began initial operations in 1955.

---

[4] Where numbered paragraphs are missing from the parties UF's, the omission is intentional; the "missing" numbered paragraphs are, in fact, disputed..

**10**.    Colbert is comprised of five "Units" that are operated to generate electricity.

**11**.    The five Units at Colbert generate electricity by burning coal to create steam, and then passing that steam through a turbine to drive a generator that ultimately produces electricity.

**12**.    The maximum heat input capacity of each of these generating units is greater than 250 million BTU per hour.

**13**.    These units have a cumulative generating capacity of approximately 1,235 megawatts of electrical power.

**14**.    Units 1-4 are roughly 50 years old and Unit 5 is 40 years old, having been placed in service between 1952-55 and in 1963, respectively.

**15**.    Airborne coal combustion by-products are emitted by Colbert Units 1-4 through a common, 650 foot stack and by Unit 5 through a second 600 foot stack.

**16**.    Colbert Units 1-5 are each a "source of emission" as that term is used in Ala. Admin. Code r. 335-3-4-.01 because each of Colbert's units emits air contaminants including particulate matter ("PM"), sulfur dioxide ("$SO_2$") and nitrogen oxides ("$NO_x$").

**18**.    To control particulate emissions and opacity, TVA operates electrostatic precipitators ("ESP") at each of its five Colbert units.

**19**.    The ESPs for Units 1-4 were installed in about 1990.

**20**.    The ESP currently operating on Unit 5 was put in service during the 1970s.

**21**.    Each of TVA's five units are required to obtain and operate in accordance with an air pollution permit.  Ala. Admin. Code r. 335-3-14-.01(1).

**22**.    The pertinent air pollution permits applicable to Colbert Units 1-5 during the relevant period (January 3, 2000 - September 30, 2002) were issued on March 13,

1998.

**24**.    Pursuant to the Alabama SIP, TVA is required to report all opacity measurements from Colbert exceeding 20 percent opacity over a six minute average to ADEM on a quarterly basis.

**25**,    TVA installed, operated, calibrated and maintained a continuous opacity monitoring system ("COMS") to monitor the opacity of the emissions from each of the stacks at TVA's Colbert Plant during all times relevant to the motion.

**26**.    COMS are used to measure the opacity of pollutants discharged into the air by passing a beam of light from the inside of one side of the stack across the exhaust path to a reflector which returns the light to the opacity sensor. The opacity sensor measures the attenuation of light from the stack's emissions.

**27**.    Pursuant to Rule 335-3-12-.02(5) and the CAA's Acid Rain Program, 42 U.S.C. § 7651k, Colbert's COMs have at all relevant times been required to comply with all applicable requirements of 40 C.F.R. Part 60, Appendix B and Part 51, Appendix P.

**28**.    At all relevant times, Colbert's COMS have been required to comply with all applicable monitoring requirements of Clean Air Act's Acid Rain Program, including 40 C.F.R. § 75.10(d)(2).

**29**.    At Colbert, opacity is measured by a COMS located in each of the two stacks associated with Units 1-4 and Unit 5 respectively.

**30**.    From May 1999 to the present, TVA has used two Spectrum Model 41 opacity monitors to measure the opacity of stack emissions from Colbert Units 1-4 and Colbert Unit 5.

**32**.    TVA has consistently performed daily, weekly, quarterly and bi-annual maintenance, calibration and re-certification procedures on Colbert's COMS for Units 1-5.

**35**.    Of the 2,351 separate six minute COMs measurements from Colbert Units 1-4 described above, 784 were greater than 20 percent and less than 25 percent.

**36**.    Of the 2,351 separate six minute COMs measurements from Colbert Units 1-4 described above, 1,567 were greater than 25 percent opacity.

**38**.    Of the 1,038 separate COMs measurements discussed above [Colbert Unit 5], 541 were greater than 20 percent and less than 25 percent.

**39**.    Of the 1,038 separate COMs measurements discussed above [Colbert Unit 5], 497 were greater than 25 percent opacity.

**55**.    The Alabama Department of Environmental Management ("ADEM") has taken an enforcement action against another TVA plant for opacity violations based on COMS alone where non-exempt exceedances beyond the 2 percent threshold were identified.

**B**.    The following undisputed facts are drawn from TVA's Response in Opposition and Sierra Club's Reply, using the same numbering system as TVA's Response in Opposition:

**2**.    Colbert Units 1-4 and Unit 5 exhaust through separate stacks, are separately permitted, and have separate continuous opacity monitoring systems (COMS).

**3**.    During the claimed violation period (January 1, 2000 - September 30, 2002), there were 240,240 6-minute periods (1001 days x 240 6-minute periods per day).  Plaintiffs claim 2,351 6-minute periods of opacity violations regarding Units 1-4, and 1,038 6-minute periods of opacity violations regarding Unit 5.

**11**.    Malfunctions in the ESPs at Colbert can cause COMS readings to rise, but such malfunctions are not the only causes of higher opacity readings.  Elevated opacity readings also can be caused by, among other things, problems with coal feeders, coal pulverizers, ash hoppers, fans and dampers, air preheaters, control equipment, and ignition systems.

**16**.    ADEM specifically oversaw and approved of the installation of the current ESPs for Colbert Units 1-4, the installation of which was completed in approximately 1990.

**17.**    TVA performed adequate maintenance testing on the ESPs at the Colbert Plant during the claimed violation period.

**19.**    Opacity as high as 100% is allowed under Colbert's opacity limit during periods of startup, shutdown, and load change.

**20**.    Most opacity exceedances [at issue] are less than 40%.

**26**.    Colbert passed all required PM mass emission tests during the operative period.

**27.**    The Colbert Plant's stack test reports demonstrate that when properly operating, its pollution control equipment at the Colbert Plant is able to meet its mass emission limit for particulate matter (PM).

**28.**    During the claimed violation period, the Colbert Plant was properly operating its pollution control equipment.

**29**.    Sierra Club does not allege *any* violations of Colbert's PM limit.

**31.**    EPA has drawn the following conclusion, but Sierra Club asserts that EPA's analysis thereof is inadequate: [T]he attainment of the primary and secondary NAAQS in the Colbert County area means that the local air quality during the claimed violation period was such as to protect public health, with an adequate margin of safety, and public welfare.[5] 42 U.S.C. § 7409(b) (2000).  (Footnote in UF 31).

**36.**    Method 9 readings are taken to the nearest 5%, and one Method 9 test represents a 6-minute average of 24 such readings taken 15 seconds apart.  40 C.F.R. pt. 60, App. A-4, Meth. 9 §§ 2.4-2.5 (2006).

**37.**    The COMS at Colbert take readings specified to 4 decimal places (e.g.,

---

[5]  The secondary NAAQS, which protect public "welfare," address "effects on soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being." 42 U.S.C. § 7602(h) (2000).

21.5297%) every 1 to 3 seconds, and one COMS reading represents a 6-minute average of 120 to 360 such readings.

38.    Method 9 readings are taken *outside* the stack, with observations "made at the point of greatest opacity in that portion of the plume where condensed water vapor is not present."  40 C.F.R. pt. 60, App. A-4, Meth. 9 § 2.3 (2006).

39.    COMS readings are taken *inside* the stack; the monitors at Colbert are located, as approved by ADEM, 300-350 feet below the stack outlet.

47.    Under the federal NSPS opacity standard – which, like Alabama law, requires Method 9 testing – COMS readings are "probative but *not conclusive* evidence of the actual opacity of an emission."  40 C.F.R. § 60.11(e)(1) (2006) (emphasis added in original).

49.    Method 9 readers may be certified despite making an average error of 7.5%.

50.    On each of the occasions identified by an "x" in the column labeled "night" on Attachments 1 through 4 to Plaintiffs' Exhibit 9, the event occurred at night.

As to opacity readings that exceed 25%, TVA has waived its credible evidence rule objections.  Pl. Ex. 9, Stip. ¶ 4; Attachs. 2 & 4.

## V.  RULE 56 STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023

(11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *Celotex*, 477 U.S. at 324.

The substantive law will identify which facts are material and which are irrelevant.  *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *Anderson*, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue

at trial.  *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  *Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of any evidence in the record in support of a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not

17

require evidence negating the non-movant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the non-moving party's case. *Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## VI.  ALABAMA'S SIP OPACITY REGULATION; EFFECT OF LAW- OF-THE-CASE

Sierra Club asserts that the Eleventh Circuit's opinion in this action, *Sierra Club v. TVA*, 430 F.3d 1337 (11th Cir. 2005), establishes liability under the law-of-the-case doctrine, for both sets of opacity exceedances, the 20% - 25% readings and the readings greater than 25% .[6]

The Court of Appeals recently described the law-of-the-case doctrine in this

---

[6]  The significance of readings above 25% and those in the 20% - 25% is discussed below.

Circuit:

The law-of-the-case doctrine holds that subsequent courts will be "bound by the findings of fact and conclusions of law made by the court of appeals in a prior appeal of the same case." Wheeler v. City of Pleasant Grove, 746 F.2d 1437, 1440 (11th Cir. 1984) (per curiam) (citation omitted). The purpose of the doctrine is to bring an end to litigation, and to protect against the agitation, or re-litigation, of settled issues. Id. (citations omitted). Although the doctrine bars reconsideration of settled issues, however, we have stated that the law-of-the-case rule is not an inexorable command, nor does it "require rigid adherence to rulings made at an earlier step of a case in all circumstances." Murphy v. FDIC, 208 F.3d 959, 966 (11th Cir. 2000) (citation omitted). Rather, we have described the doctrine as "direct[ing] a court's discretion" rather than "limit[ing] the tribunal's power." Id. We are not bound under the doctrine to "adhere to a ruling with which we have emphatically and repeatedly disagreed." Id.

Moreover, there are three notable exceptions to the doctrine. We will not be barred from reconsidering the law-of-the-case "when (1) a subsequent trial produces substantially different evidence (2) controlling authority has since made a contrary decision of law applicable to that issue or (3) the law-of-the-case is clearly erroneous and will work manifest injustice if not reconsidered." Wheeler, 746 F.2d at 1440 (citation omitted).

Culpepper v. Erwin Mortgage Corp., 491 F.3d. 1260, 1271 (11th Cir. 2007)("Culpepper IV")August 25, 2007.

Ala. Admin. Code r. 335-3-4-.01(1) ('Visible Emissions Restrictions for Stationary Sources') is the applicable SIP regulation. Subpart (a) prohibits emissions that exceed 20% opacity[7] ". . . as determined by a six (6) minute average". Subpart

---

[7] "'Opacity' refers to the visibility of the emissions exiting the stack. A 100% opacity would mean that no light at all could pass through the emissions, whereas 0% opacity would

(b) provides an hourly safe harbor: a 40% opacity discharge is permitted during one 6 minute period in any sixty minute period.  Subpart (c) places authority in ADEM's Director to approve exceptions to the Rule or to specific sources for startup, shutdown, load change, rate change, or other short, intermittent periods of time upon terms approved by the Director and made a part of the operator's CAA permit. Subpart (d) allows the Director to approve exceptions for sampling and testing, with the procedures set out in Ala. Admin. Code r. 335-3-4-.01(1)(d)1.-5.

The parties are at issue over Ala. Admin. Code r. 335-3-4-.01(1)(a) and (b). Sierra Club says, and the court does not understand TVA to disagree, that Sierra Club's evidentiary submissions have been tailored to eliminate all opacity readings over 20% where TVA claims any of the Ala. Admin. Code r. 335-3-4-.01(1)(c) safe harbor provisions (startup, shutdown, load change, rate change), or any other exception(s).

The court begins the law-of-the-case analysis by acknowledging the obvious: in *Sierra Club v. TVA, supra*, the Eleventh Circuit did not appear to leave TVA any liability wiggle room:

---

mean light passes completely through the emissions and they are effectively invisible. While opacity is not itself a regulated pollutant, it acts as a measurement surrogate for particulate matter, which is a regulated pollutant for which the EPA has set national ambient air quality standards."  *Sierra Club v. Georgia Power*, 443 F.3d 1346, 1350 n.4 (11th Cir. 2006).

We begin with the question of whether ADEM's 2% de minimis rule, followed as a practice at all times relevant to this lawsuit, applies to excuse the violations alleged in the complaint.  If it does, the lawsuit is over.  Although the COMS data show thousands of instances where the Colbert plant's emissions exceeded 20% opacity during the relevant period, none of those instances are violations if the 2% de minimis rule applied.   We have already discussed the specifics of that rule and the parameters of the safe harbor it provides for pollutant discharges.   See Part II. B, above.   We need not reiterate the technical details *because both sides agree that if the 2% de minimis rule is valid, there are no violations;  if it is not, there are plenty.*

430 F.3d at 1346 (emphasis supplied).

Not surprisingly, Sierra Club has quoted the emphasized language at every turn since *Sierra Club* was decided.  And it comes as no surprise that TVA has spent at least as much time and effort to either recast the issue(s) to avoid the implications of *Sierra Club* on TVA's defenses in this action, or to recast the emissions data so as to dock the readings in one of the Alabama SIP's safe harbors.[8]

The court finds that the law-of-the-case doctrine applies here, and that none of the three (3) exceptions described in *Culpepper IV* are present or applicable.  The Eleventh Circuit's opinion guides the court's consideration, and that opinion leads inexorably to the conclusion that, without the 2% *de minimis* exception, TVA's data and reports to ADEM show Colbert has exceeded the opacity limits of the Alabama

---

[8] *See, e.g.*, the Order striking the Declaration of Michael A. Gean, # 149, at pp. 3 -5. (Gean Declaration a belated and untimely attempt to reclassify at least 800 of the >20% readings as equipment malfunctions, another 2,700 arguably into one of the SIP's safe harbors.)

21

SIP and its operating permit thousands of times. Application of law-of-the-case to the undisputed facts is one way in which Sierra Club has satisfied its burden of establishing liability for the proven opacity violations.

## VII.  SIERRA CLUB'S PRIMA FACIE SHOWING IT IS ENTITLED TO SUMMARY JUDGMENT AS TO OPACITY READINGS THAT EXCEED 25%

It is undisputed that TVA has waived its credible evidence rule objections to opacity readings that exceed 25%.   Pl. Ex. 9, Stip. ¶ 4; Attachs. 2 & 4.  August 16, 2007 Hearing Transcript, p. 21, lines 21 -23. There were 1,567 such readings at Colbert 1-4, and 497 at Colbert 5.  In doing so, TVA is acknowledging what the court would find without such waiver, *i.e*., in light of *Sierra Club, supra*, TVA has no viable technical or permit defenses to opacity readings above 25%.

## VIII.  TVA'S CONTENTIONS IN OPPOSITION AS TO ALL OPACITY READINGS (I., II., IV.) AND OPACITY READINGS BETWEEN  20% - 25% (III.)

In its Brief in Opposition, # 142, TVA says partial summary judgment is unwarranted because:

I.      The court should stay the action;

II.     Sierra Club has not established causation;

III.    Sierra Club is not entitled to judgment as to COMS readings below 25%, and events occurring at night, nor should the court proceed to a remedies phase at this time; and

IV.    TVA has not conceded, and does not concede, liability.

Discussion

I.    The court should stay the action - TVA moved to stay the action, citing potential EPA approval of the 2% *de minimis* rule being incorporated as part of Alabama's SIP. (# 135). The court denied TVA's motion July 16, 2007. (# 150). That decision will not be revisited.

II.    Sierra Club has not established causation - TVA's argument on causation says Sierra Club was required to link any opacity violation to an injury or damage to its member(s) and that it has failed to do so:

> Plaintiffs have not established that *any* of the claimed violations *caused* them injury. In fact, the only injury Plaintiffs claim their members have suffered is the sight of what they considered to be ugly plumes of smoke, but those individuals did not observe a plume of smoke on *any* of the occasions when Plaintiffs contend TVA violated the law. (*UF #34.*) In their motion, Plaintiffs failed to address causation altogether, and have identified no plausible theory of liability causation in this case.

Brief, # 142 at 20.

The issue raised here is whether, once an organization has been determined to have standing to bring a CAA action on behalf of its members, that organization, here Sierra Club, must then prove additional injury to its members caused by the alleged, or proven, violations of the Act. The court says "additional injury" because an organization proves standing by proving injury to at least one of its members. Sierra

23

Club's standing is, without question, a nonissue under law-of-the-case:

> The first requirement of associational standing is that at least one member meets the three requirements of individual standing.   In an environmental case, an individual plaintiff may show the first of those requirements, injury in fact, by attesting that he uses, or would use more frequently, an area affected by the alleged violations and that his aesthetic or recreational interests in the area have been harmed.   *See id.* at 183-84, 120 S.Ct. at 705-06;   *see also Parker v. Scrap Metal Processors, Inc.,* 386 F.3d 993, 1004 n. 11 (11th Cir.2004); *Nat'l Parks Conservation Ass'n v. Norton,* 324 F.3d 1229, 1242-43 (11th Cir.2003). Members of the Sierra Club and the Alabama Environmental Council have done that in this case.

*Sierra Club v. TVA*, 430 F.3d at 1344 - 1345.

Quoting the court to itself, *Nat'l Parks Conservation Ass'n v. TVA*, No. 01-403-VEH (N.D. Ala. Sept. 7, 2005) (Ex. 27), (NPCA had "met its burden of establishing standing to bring [the] action," (*id*. at 6) nevertheless NPCA still needed "to prove causation" or else "the action fails without regard to standing" (*id*. at 8-9).[9]  TVA says Sierra Club has, at best, proven an opacity violation without proving that the violation actually caused injury to any member, making this a case of "*damnum absque injuria*: a legal wrong that has caused no real prejudice." *Miles v. M/V Miss. Queen*, 753 F.2d 1349, 1353 (5th Cir. 1985) (table).  *Cf. Higbee v. Starr*, 598 F. Supp. 323, 332 (E.D. Ark. 1984) (Clean Water Act case; "causality" is "an essential element in proving

---

[9]  *NPCA* is on appeal and does not constitute precedent.  The quoted language, when examined in context, was a remark made in passing, and *dicta*.

liability"), *aff'd*, 782 F.2d 1048 (8th Cir. 1985).

TVA acknowledges that neither the Supreme Court nor the Eleventh Circuit has squarely addressed this issue, but says the Eleventh Circuit has recognized the distinction between the "fairly traceable" inquiry that is part of the standing analysis and proof of ultimate causation on the merits, citing *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005) ("*Cox*") (defendants' causation argument regarding standing "conflates standing with the merits of the case").

While acknowledging that the *Cox* language may be *dicta*, and the issue may demand more attention and analysis than the reader finds here, the court reads *Cox* as suggesting that this is a distinction without a difference

> Ms. Crawford's alleged injuries are also "fairly traceable" to Defendants' actions. Defendants' causation argument, that the root of Crawford's attempted address change's inadequacy was her own lack of compliance with Georgia's requirements, conflates standing with the merits of the case. Causation in the standing context is a question of fact unrelated to an action's propriety as a matter of law. To establish causation a plaintiff need only demonstrate, as a matter of *fact,* "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Parker,* 386 F.3d at 1003. Ms. Crawford's alleged injuries flow directly from the denial of her registration form.[FN3]
>
>> FN3. Though Defendants do not pursue the question, Ms. Crawford's injuries are also redressable: the injunctive relief provided by a favorable decision in this case would redress Ms. Crawford's injuries by permanently withdrawing the additional registration requirements Defendants seek to impose upon her. The fact that the issuance of the preliminary injunction forced the state to accept the sixty-four forms for purposes of elections occurring during this suit's pendency does not affect our analysis. Standing is to be "determined as of the time

> ... the plaintiff's complaint is filed," and is not altered by events unfolding during litigation. *Focus on the Family v. Pinellas Suncoast Transit Auth.,* 344 F.3d 1263, 1275 (11th Cir.2003).*Id.*

This language suggests that, as in *Cox* and, the court finds, here, the injury required for standing can also suffice for causation under facts such as those presented here, assuming further proof of causation is required beyond that used to establish standing.

To hold otherwise would lead to a nonsensical result. Sierra Club has the Eleventh Circuit's holding that it has standing in this action, but because Sierra Club cannot tie TVA's opacity violations to a specific Sierra Club member's injury (the members couldn't see the opacity violations because they're not black smoke, the members couldn't see nighttime violations, *et al.*), then Sierra Club cannot pursue injunctive or declaratory relief. Congress could not have intended the citizen's suit provision to be eviscerated this way. The reality of CAA citizen suit litigation is that it is expensive, complicated, and protracted; as a practical matter, most such actions will be brought by plaintiffs like Sierra Club, who have the legal, financial, and technical resources to maintain a citizen suit action. If tying each opacity violation to a specific member's injury is required, the citizen suit remedy provided by Congress would be illusory.

III.     Sierra Club is not entitled to judgment as to COMS readings below 25%, and events occurring at night, nor should the court proceed to a remedies phase at this time.

This argument is in turn broken down into three (3) subparts:

A.     COMS readings below 25% are not violations;

B.     Sierra Club has no standing to assert violations occurring at night;

C.     The Court should stay remedies proceedings;

A.  Initially, TVA's argument that readings between 20% and 25% are not violations is in conflict with the credible evidence rule.  Effective on January 3, 2000, the Alabama SIP's credible evidence rule, Ala. Admin. Code r. 335-3-1-.13(1),[10] has provided that:

> (2) . . . Notwithstanding any other provision in ADEM Admin. Code Division 3, any credible evidence or information relevant to whether a source would have been in compliance with applicable requirements if the appropriate performance or compliance test had been performed, can be used to establish whether or a not an owner or operator has violated or is in violation of any rule or standard in this Division.

Sierra Club v. TVA, 430 F.3d at 1342-43.

_____

[10]   This provision was incorporated into the Alabama SIP at 64 Fed. Reg. 59,633 (November 3, 1999) ("EPA required states to incorporate provisions into their SIPs to ensure that the states have the ability to use any available data or 'credible evidence' to determine violations."); 40 C.F.R. § 51.212(c) (calling for all state SIPs to include and "any credible evidence" provision); Credible Evidence Revisions, 62 Fed. Reg. 8314 (February 24, 1997).

27

## COMS: What They Are; How They Work

"At the time this lawsuit was filed, the Colbert plant was operating under permits ADEM had issued in March 1998.  One of the requirements of the Colbert plant's air permits is that TVA install, maintain, and operate a continuous opacity monitoring system ("COMS") in each of the plant's smokestacks.  *See* Ala. Admin. Code r. 335-3-12-.02(3).  As its name indicates, COMS is a device that monitors continuously the opacity of a plume of smoke.

Opacity is one of the most basic emission limitations imposed on sources of particulate air pollution such as the Colbert plant's two smokestacks.  The term "opacity" refers to the extent to which a plume of smoke "reduce[s] the transmission of light and obscure[s] the view of the background." Ala. Admin. Code r. 335-3-1-.02(1)(tt).  For example, a plume with 20% opacity blocks 20% of light passing through it;  no light passes through a plume with 100% opacity.  Opacity is not a pollutant, but instead is a measure of the light-blocking property of a plant's emissions, which is important in the Clean Air Act regulatory scheme as an indicator of the amount of visible particulate pollution being discharged by a source.

COMS measures opacity by projecting a beam of light across the interior diameter of a smokestack to a mirror mounted on the opposite side of the smokestack wall and measuring how much of the light is reflected back.  COMS then records the amount of light that was absorbed or scattered on the trip.  It is undisputed that at all relevant times each of the Colbert plant COMS has functioned properly, accurately measuring opacity."

*Sierra Club* at 1340 -1341.

In factual support of its argument, TVA offers the Declaration of its expert witness Ralph Roberson as ". . negating the proposition that COMS readings *always and necessarily* correlate with what a Method 9 would show:

In general, there is no basis for concluding *a priori* how COMS readings at Colbert correlate or relate to visual observations taken at the same time pursuant to EPA Reference Method 9. That is, in the absence of sufficient data gathered by both methods, there is no way to say with certainty that COMS and Method 9 would yield equivalent results for any particular six-minute measurement period. This is because, among other things: (a) Method 9 requires the observer to record the observation to the nearest 5 percent increment, which is not the case with a COMS monitor reading; (b) the COMS monitor results are themselves variable within a fairly narrow percentage range of accuracy; and (c) the COMS readings and Method 9 readings are not taken at the same point in the exhaust stream (COMS monitors are located a considerable distance below the top of the stacks), which means it is possible that the exhaust stream could have different opacity characteristics at these two distinct measurement elevations. In order to determine if there is any correlation and what the relationship is (if any) between readings taken by the two methods, one would have to have sufficient simultaneous readings under sufficiently diverse sets of circumstances, and then subject those data sets to appropriately rigorous statistical analysis.

#28, Ex. 3, Roberson Decl. at ¶ 21. (Emphasis in original)

TVA's <u>legal</u> argument is this:

As the Eleventh Circuit's ruling in this case made clear, Alabama's opacity standard itself supports a finding of violation only if there is evidence from the specified compliance test, Method 9. *Sierra Club*, 430 F.3d at 1350-53. Here, there is no Method 9 evidence establishing a violation. Instead, Plaintiffs contend they have established a violation using COMS data under Alabama's credible evidence rule, which permits the introduction of evidence "relevant to whether a source would have been in compliance with applicable requirements *if the appropriate performance or compliance test had been performed*." <u>Ala. Admin. Code r. 335-3-1-.13(2)</u> (2003) (emphasis added). Under the plain language of this rule, when a case is proven using the credible evidence rule rather than the specified compliance

test, the proffered alternative evidence must show what a compliance test would have shown if it had been performed.  *See also* 62 Fed. Reg. 8314, 8316 (Feb. 24, 1997) ("where an emission limitation specifies a particular monitoring or testing method approved by EPA for use in the SIP to determine compliance, data from such method will continue to be the benchmark against which other emissions or parametric data, or engineering analyses, will be measured").  Here, the compliance test is Method 9.

As EPA has made clear, even under the credible evidence rule "information generated from an appropriate and properly conducted test method established under the general provisions of part 60" – here, a Method 9 test – "will still generally be the *best method* for determining a source's compliance."  62 Fed. Reg. 8314, 8317 (emphasis added). Having chosen to forego the "best method" for proving a violation, Plaintiffs must establish a correlation between the COMS data upon which they rely and "the appropriate performance or compliance test," Method 9.  Ala. Admin. Code r. 335-3-1-.13(2) (2003).  TVA has objected to Plaintiffs' reliance on COMS readings below 25%.  Pl. Ex. 9, Stip. ¶ 4.  As to these COMS readings, Plaintiffs have not satisfied their burden to prove that a Method 9 test *would have* resulted in a determination that opacity was greater than 20%.

First, it is undisputed – indeed, indisputable – that COMS and Method 9 are simply not equivalent.  (*UF #36-42*.)  It is never certain that a COMS reading and a Method 9 test taken at the same time will yield the same result.  TVA's evidence casts doubt on whether the COMS readings below 25% would correspond to a Method 9 reading above 20%, and TVA's evidence would support a finding that there is no such correspondence.  (*UF #36-49*.)

Sierra Club and TVA agree that the two testing methodologies are not the same.  Method 9 testing is based on human observations and subject to a 5% margin of error; COMS devices are light beam measuring devices placed within the plant's

emissions stacks at a calibrated height, the devices are calibrated daily, readings are taken continuously, then averaged at six-minute intervals, and the margin of error, while disputed by the parties, has nothing to do with the vagaries of human observation powers.

The court does not agree with TVA's reading of *Sierra Club*, and specifically with TVA's assertion that *Sierra Club* requires that COMS reading must be correlated with Method 9 in the manner urged by TVA.  COMS data is credible evidence by itself, and the fact that a Method 9 test may yield a different result simply means the court would have two (2) different tests to consider in its decision making.

> "Before the credible evidence rule was added to Alabama's SIP, the opacity provision in the SIP stated that the only authorized method for determining opacity violations was by use of Reference Method 9, Ala. Admin. Code r. 335-3-4-.01(2), which, as we have discussed, depends on readings performed only a few times a year by observers in the field. See Part II. A, above.   This is how a former ADEM deputy director described the Method 9 enforcement situation:
>
> Because compliance with the opacity standard using Method 9 readings is determined for most sources during 1-15 days/year, a typical source would be subjected to 2-30 hours of compliance determinations per year using Method 9.   This represents less than 0.5% of the available operating hours.  If plant variability and malfunctions causing elevated opacity occur at a source 3% of the time, the chances of such events coinciding with a Method 9 observation are remote.
>
> (Affidavit of Richard E. Grusnick in support of TVA's motion for summary judgment.)  ***The credible evidence rule, added to Alabama's SIP at EPA's insistence, changed the situation entirely, because it***

31

***allowed use of COMS data to determine opacity violations.   Instead
of enforcement being based on less than one-half of one percent of a
source's operation, and only that occurring during daylight hours,
enforcement is now based upon all emissions***."

*Sierra Club* at 1347 -1348.  (Emphasis supplied).

Further, adopting TVA's argument would permit, even codify, the sporadic and
lax enforcement Method 9 testing criticized by the Eleventh Circuit in *Sierra Club,
supra*.  430 F.3d 1342, 1347.  *Sierra Club* says, and the court finds nothing in the
record to the contrary, that the history of Method 9 use as an enforcement tool is that,
in its real world application, Method 9 has been an enforcement program in name
only.  And, again in the real world, the court cannot determine from the record before
it how one would go about "correlating" a COMS reading with a simultaneous
Method 9 reading.  TVA doesn't say how it can be done, either, August 23, 2007,
Hearing Transcript p. 25 at lines 14 - 24, only that a plaintiff, here Sierra Club, has
to do so.

Further, the court does not read the credible evidence rule to require such a
correlation:

(2) . . . Notwithstanding any other provision in ADEM Admin. Code
Division 3, any credible evidence or information relevant to whether a
source would have been in compliance with applicable requirements if
the appropriate performance or compliance test had been performed, can
be used to establish whether or a not an owner or operator has violated
or is in violation of any rule or standard in this Division.

32

Ala. Admin. Code r. 335-3-1-.13(1).

This does not say "provided the credible evidence is itself calibrated or correlated to the specified test and what that test would have shown if performed", and the court declines TVA's invitation to construe the regulation in such a restrictive manner.  The clear meaning of the regulation is that, in lieu of Method 9 (and now LIDAR), any credible evidence can be used to measure whether a source is in compliance.  Finally, even if the court thought that the Alabama SIP actually imposed such a requirement, it views *Sierra Club* as having settled the issue:

> "The command is that only Method 9 data may be used to determine opacity violations, and that command governed ***until*** Alabama's credible evidence rule, Ala. Admin. Code r. 335-3-1-.13(2), became effective on May 20, 1999."

430 F.3rd 1437, 1451.  (Emphasis supplied).

If COMS measurements have to be matched up to, correlated or related back to, or scientifically explained in terms of what a  simultaneously taken Method 9 test would have shown, then the credible evidence rule is meaningless.  The court will not construe a properly adopted EPA regulation, which in turn is part of Alabama's EPA-approved SIP, to be meaningless.

IV.    <u>TVA has not conceded, and does not concede, liability.</u>

It is not outcome determinative whether or not TVA has "conceded" liability. Even assuming that *Sierra Club v. TVA* did not establish, under the law-of-the-case doctrine, that TVA agreed that there were "plenty" of emissions violations, the court has independently analyzed whether, on the record before it, Sierra Club has established CAA emissions violations by TVA's Colbert plant.  And, having done so, the court finds that there are no material facts in dispute about the opacity exceedances and that TVA has violated the Act, the Alabama SIP, and its Title V permit because of those exceedances.

There is not a material factual dispute over whether Sierra Club's emission submissions establish numerous incidents where emissions from the  Colbert plant exceeded the Alabama's SIP's 20 % opacity limit.  For example, between January 3, 2000, and September 26, 2002, the opacity of pollution from Colbert's Unit 5 was greater than 20 % on 1,038 separate, six minute periods.[11]

Further, at a hearing on summary judgment held in 2004, the court inquired of TVA whether it "agree[d] that all of the alleged violations were greater than twenty percent opacity?"   Hearing Tr. (# 81) at 4 (Sierra Club Motion, Ex. 1).   TVA

---

[11]  This figure excludes additional exceedances that Sierra Club stipulated to drop for the sake of expediency.  1/2/07 Transcript of Hearing Regarding Lifting of Stay at 91-94.

responded that "8,933 events that the plaintiffs claim to be violations all registered opacity greater than twenty percent according to the opacity monitor." *Id.* The violations involved in this motion are far fewer, because Sierra Club has elected to concede, for purposes of the motion, any opacity reading over 20% where TVA claims a safe harbor was available.

Finally, there has been discussion in the parties' pleadings about whether TVA waived its right to object to readings falling between 20% - 25%. The court finds TVA has not. That said, the court also finds that TVA cannot be heard on any argument based, in whole or in part, on Sierra Club's not obtaining, from TVA or elsewhere, opacity data more detailed than the six (6) minute opacity averages previously described. The reason , as TVA candidly acknowledged at the August 16, 2007, hearing on the motion, is that TVA's computers did not, and do not, save COMS readings any more frequently than the six (6) minute average. August 13, 2007 Hearing Transcript, p. 21, lines 11 - 23. Sierra Club cannot be criticized for its failure to study, or have an expert opine on, data that does not exist. For better or worse, the motion, and the case, rely on the six (6) minute averages recorded by TVA and reported to ADEM.

## IX.  **LIABILITY ANALYSIS**

In an effort to tie together the parties' various points / counterpoints, the court summarizes, recapitulates, what have you, the liability issue before it as follows. Under the Act, "[sources subject to Title V may not operate in violation of, or without, a Title V permit containing all applicable requirements." *Sierra Club v. Leavitt*, 368 F.3d 1300, 1302 (11th Cir. 2004).  It is undisputed that TVA's Colbert plant is a Title V source, that it operates pursuant to  Title V permits (motion, Ex. 4), and that the Colbert permits incorporate the 20% provisions of Alabama's SIP, *id*. ¶ 8  (Permit #701-0010-Z009) & ¶ 9 (Permits #701-0010-Z0010, 701-0010-Z011, & 701-0010-Z012).  The permits require reporting of "[t]he average and maximum excess emissions computed from six minutes averages".  *Id*.  Pursuant to the SIP, the emissions from TVA's Colbert plant cannot exceed a 20 percent opacity limit during any six minute period, subject to the exceptions set out in Ala. Admin. Code r. 335-3-4-.01(1)(a).  Ala. Admin. Code r. 335-3-4-.01 (approved as part of the Alabama SIP at 40 C.F.R. § 52.69(c), 63 Fed. Reg. 70,669 (Dec. 22, 1998) (40 C.F.R. § 52.50 redesignated as 40 C.F.R. § 52.69)).  Ala. Admin. Code r. 335-3-4-.01(1)(a) ('Visible Emissions Restrictions for Stationary Sources').

The 20% opacity limitation, in turn, allows for four (4) exceptions, or safe harbors.  One of them is an exception that allows any source to emit a plume with

36

opacity of up to 40% for one six-minute period per hour.  *Id* r.335-3-4-.01(1)(b).[12]

Sierra Club's relevant evidentiary submissions are found as Attachments 1 - 4 of Exhibit 9 of its summary judgment motion.  Attachments 1 & 2 are tables of opacity readings taken from Colbert 1 - 4;  Attachments 3 & 4 are tables of opacity readings taken from Colbert 5.  All the table readings were taken from January, 2000, through September, 2002, the periods at issue in this action.  Attachments 1 (Colbert Units 1 - 4) and 3 (Colbert Unit 5) show opacity readings between 20% - 25% at those units, respectively, while Attachments 2 and 4 show opacity readings that exceed 25% at the same units, respectively.  The submissions are all based on TVA's continuous opacity monitoring system ("COMS")[13].  The tables are drawn from TVA's required quarterly emissions report to ADEM.

Sierra Club's summary judgment motion asserts that those readings, because they exceed the permitted 20% opacity limit and are not otherwise excused under the Alabama SIP, constitute violations of the Clean Air Act.

TVA also asserts that Sierra Club's failure to offer expert testimony is fatal to its opacity violation assertions.  It cites the January 11, 2007, district court opinion

---

[12]  How the six minute period per hour is measured has been discussed at a prior hearing. The court said then, and still says, an "hour" begins with the big hand of the clock on 12 and the little hand at whatever hour, a.m. or p.m., it happens to be, and ends fifty-nine (59) minutes and fifty-nine (59) seconds later.

[13]   TVA has not contested the accuracy of its COMS.  (# 25, Ex. 7-126, 130, 135).

in *Sierra Club, et al. v. Georgia Power Company*, Case No. 3:02-CV-151-JTC. (N.D.Ga.).  This ruling  involved cross motions for summary judgment on remand from *Sierra Club v. Georgia Power Co*., 443 F.3d 1346 (11th Cir. 2006).  (#140, Ex. 26).  On remand, as explicitly permitted by the Eleventh Circuit's ruling, Georgia Power offered evidence that many, if not all, of the claimed opacity exceedance violations were in fact caused by startup, shutdown, and malfunction ("SSM").[14]  It offered the report and testimony of an engineer and expert witness, Richard McRaney, for example.  Sierra Club did not attempt to depose Georgia Power's expert witnesses.  "All that Sierra Club has done thus far is merely offer its interpretation of Georgia Power's expert testimony on these issues".  *Id*. at 10.  In contrast, here, Sierra Club has offered expert testimony in support of its earlier summary judgment motions, *e.g*., Declaration of William T. Winberry (#133 Ex. 7), the Supplemental Winberry Declaration (#133, Ex. 6), and the (untitled) Declaration of William Winberry (#133, Ex. 8).[15]  These declarations are addressed, *inter alia*, to opacity measurements, the use of COMS, the relationship between COMS and LIDAR, the relationship between COMS readings and Method 9 testing, the accuracy

---

[14]  By contrast, here Sierra Club has conceded, for purposes of the motion, all opacity readings above 20% where TVA claims one of the safe harbors in the Alabama SIP; the concession eliminates approximately 5,400 such readings.

[15]  The court finds both Winberry and Robertson qualified to express the opinions contained in their respective Declarations.

of COMS readings, and the use of COMS readings as appropriate ("credible") evidence in these proceedings. *See, e.g.* <u>Ala. Admin. Code r. 335-3-12-02</u>; 40 C.F.R. 60, Appendix B, Performance Specification 1.   Taken together, the Winberry declarations support Sierra Club's contention that the COMS readings over 20% <u>do</u> equate to opacity readings over 20%, and therefore such COMS readings are a violation of Colbert's 20% opacity limit as set forth in its operating permits, which in turn incorporate the opacity limits of the Alabama SIP.

TVA's most recent submission of the declaration of Michael A. Gean ("Gean"), which the court struck (#149), had it been allowed, would not be commensurate with the McRaney report in *Georgia Power, supra*.   McRaney is an engineer hired by Georgia Power as an expert.   Gean is employed as an Environmental Program Administrator at the Colbert plant.   (#144, p.1).

Finally, TVA's position in this litigation has been that ". . . **TVA does not intend to undertake such a one-by-one examination of the appropriate exemption classification and does not intend to present such  one-by-one evidence to the Court in defense of the Plaintiffs' claim for injunctive relief**". (#133, Ex. 12 at p.2).  (Emphasis supplied).

And, while not on point for this motion, even were TVA able to show at trial a series of Method 9 tests performed contemporaneously with  COMS readings, with

the Method 9 readings under 20%, and the COMS over 20%, the court would not have to accept TVA's technical or margin of error assertions.   Advances in technology are not necessarily more accurate but, having reviewed the voluminous filings and the declarations by various witnesses dealing with opacity testing methodology, the court finds that there is not a material factual dispute that COMS monitoring is, first, credible evidence, second, a more accurate and reliable testing methodology, and third, that the TVA Title V permit and the Alabama SIP have taken the technical issues of continuous monitoring into account in setting the opacity limit.[16]

The court appreciates TVA's predicament.  According to TVA's facts, Colbert 1 - 4 met opacity requirements 99% of the time, and Colbert 5 met the requirements 99.5% of the time.  Those are high rates of compliance.  The problem, as noted by the Eleventh Circuit, is that continuous compliance is required.  *Sierra Club, supra* 430 F.3d at 1438 .  The court sees TVA confronting, in this setting, the same problem it had at the Eleventh Circuit with the 2% *de minimis* "exception", and the court

---

[16]  The court notes, as it has in the past, that Georgia's SIP has a 40% opacity limit.  The court acknowledges TVA correctly says Georgia is not the only 40% opacity limit state.  The court says in response that it does not make emissions policy.  *Duke Energy, supra*, has made it very clear that this court's role in reviewing EPA regulations does not encompass passing on the wisdom of EPA approval of SIPs with different opacity limits in adjacent states where the power plants are both coal burning.  The court may not think EPA's divergent regulations are logical, but the court's role is not to substitute its judgment for EPA's.

believes that the Eleventh Circuit has already provided the responsive analysis:

> The gist of TVA's argument is that a 2% safe harbor from the opacity limitation is needed to loosen the tighter pinch of the opacity limitation when enforced through the relentlessly effective COMS method in lieu of the hit-and-miss (mostly miss) enforcement possible with Method 9. It's a brassy argument.

*Id*.

The gist of TVA's arguments continues to be that some relief or safe harbor is needed from COMS readings that exceed 20% opacity.  The court believes a faithful application of the remand in *Sierra Club* leaves no room for such relief and provides no additional, or applicable, safe harbor from the excess opacity readings.  Finally, using Method 9 to undercut COMS would seem to directly contradict *Sierra Club*'s direction that Method 9 correlation or reference was required <u>until</u> the adoption of the credible evidence rule.

> The command is that only Method 9 data may be used to determine opacity violations, and that command governed until Alabama's credible evidence rule, <u>Ala. Admin. Code r. 335-3-1-.13(2),</u> became effective on May 20, 1999.

*Sierra Club*, 430 F.3d at 1351.

The above *Sierra Club* excerpts, combined with the Eleventh Circuit's favorable citation of cases where COMS data has been used to win CAA cases, *e.g.*, *Sierra Club v. Pub. Serv. Co. of Colorado, Inc.,* 894 F.Supp. 1455 (D.Colo.1995) (allowing use of COMS data to establish opacity violations where the Colorado regulation provided solely for use of Reference Method 9)), is, to the court, a pretty good indication that *Sierra Club*, far from requiring COMS - Method 9 correlation, permits the use of COMS readings, standing alone, to establish opacity violations.

Accordingly, for the reasons stated, Sierra Club's Third Motion for Summary Judgment on Liability is **GRANTED**.  Judgment will be entered in favor of Sierra Club and against TVA for the following violations of the Clean Air Act, the Alabama SIP and TVA's Title V permits taking place between January 3, 2000, and September 30, 2002:

> - <u>Colbert 1 - 4</u>: 2,351 separate six minute violations; 784 greater than 20 % and less than 25 %; 1,567 greater than 25 % opacity;
>
> - <u>Colbert 5</u>:  1,038 separate  six minute violations; 541 greater than 20 % and less than 25 percent; 497 greater than 25 %.

A separate Order will issue.

**DONE** this the 27th day of August, 2007.

**VIRGINIA EMERSON HOPKINS**
United States District Judge