FILED

2009 Jan-06  AM 09:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| SIERRA CLUB and ALABAMA ENVIRONMENTAL COUNCIL, INC., | ) ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | No. 3:02-cv-2279-VEH |
| TENNESSEE VALLEY AUTHORITY, | ) ) ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

### I.    PROCEDURAL POSTURE

This action commenced on September 16, 2002.  (Complaint, Doc. 1).  The

Plaintiffs, Sierra Club and Alabama Environmental Council, Inc. ("Plaintiffs"),

complained that the Tennessee Valley Authority ("TVA") had violated the Clean

Air Act, and the Alabama State Implementation Plan (the "SIP").  Specifically,

Plaintiffs alleged that TVA had violated, at its Colbert Plant ("Colbert") the 20%

opacity limit contained in the SIP and thereby violated 42 U.S.C. § 7604(a)(1) and

(f), the SIP, Alabama Admin. Code r. 335-3-4-.01(1)(b) and the Colbert Title V

Permit.  (Complaint, Doc. 1, *passim*).

In 2002, the Sierra Club and the Alabama Environmental Council

("Plaintiffs") sued the Tennessee Valley Authority ("TVA") under the Clean Air

Act, 42 U.S.C. §§ 7401-7671q, ("the Act"; "CAA";) claiming that TVA's plant in

Colbert County, Alabama ("the Colbert plant"; "Colbert") violated Alabama's State Implementation Plan ("SIP") adopted by the Alabama Department of Environmental Management ("ADEM") and approved by the U.S. Environmental Protection Agency ("EPA").  *See* 40 C.F.R. § 52.69, *et seq.* and previously at 40 C.F.R. § 52.50 *et seq.*  Plaintiffs claimed that TVA repeatedly violated the SIP's 20% opacity limit, Ala. Admin. Code r. 335-3-4-.01(1)(a), and the Colbert Plant's Title V Air Permit, 701-0010-Z009 through 701-0010-Z013.  The Complaint alleged a violation of the CAA each time the Colbert plant exceeded the 20% "opacity" limit.  (Such events are hereinafter referred to as "exceedances.") Initially, there were said to be more than 8,900 exceedances during the five-year period from 1997 to 2002 when the Complaint was filed.  Plaintiffs sought an order enjoining TVA's exceedances, and the imposition of civil penalties.  (Doc. 1, *passim*).

In September, 2004, the court granted summary judgment to TVA on all claims for two reasons.  (Doc. 83).  The first reason, which covered all claims made by Plaintiffs, was that all the claimed exceedances were within the forgiveness zone, or safe harbor, of ADEM's so-called "2% *de minimis* rule."  The court held that it should defer to Alabama's regulation, Ala. Admin. Code r. 335-3-4-.01(4), and the manner in which ADEM, the regulating agency, interpreted the SIP.  The second reason was that data generated by the Colbert plant's

continuous opacity monitoring system ("COMS") could not be used to establish opacity violations that occurred before May 20, 1999, the date ADEM adopted its "credible evidence rule," Ala. Admin. Code r. 335-3-1-.13(2).   Previously, on February 20, 2003, Judge Johnson had held that sovereign immunity principles would bar the assessment of civil penalties against TVA.  (Doc. 13).

Plaintiffs timely appealed.  In *Sierra Club v. TVA*, 430 F.3d 1337 (11th Cir. 2005) (Doc. 90) ("Sierra Club"), the Eleventh Circuit:

1)   affirmed this court's decision on the application of the "credible evidence" rule to this action;

2)   reversed this court's ruling that ADEM's use of the 2% *de minimis* rule was a permissible interpretation of the Clean Air Act, holding instead that ADEM's use of the 2% de minimis rule throughout the period in question was an illegal, unilateral modification of the Alabama SIP, 42 U.S.C. § 7410(I); 40 C.F.R. § 51.105, and that Alabama's interpretation of its state implementation plan (SIP) cannot change the Act's mandate of continuous compliance. Clean Air Act, §§ 110, 302(k), 42 U.S.C. §§ 7410, 7602(k);

3)   affirmed Judge Johnson's ruling that TVA was immune from civil penalties under the Act; and

4)   remanded the action for proceedings consistent with the Court's opinion.

On remand, this Court initially stayed the action to await the Supreme Court's decision in *Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561, 127 S.Ct. 1423, 167 L.Ed.2d 295 (2007) ("*Duke Energy*"); the District of Columbia Circuit's decision in *New York v. E.P.A.*, 443 F.3d 880 (D.C. Cir. 2006), *rehearing en banc denied* June 30, 2006 (Case No. 03-1380) ("*New York II*"), and

the appeals of this court's decisions in *National Parks Conservation, Inc. and Sierra Club v. Tennessee Valley Authority* (a case involving construction work at Colbert in the early 1980's), 413 F.Supp. 2d 1286 (N.D. Ala. 2006) CV-01-403-VEH, and *United States v. Alabama Power Co.*, 372 F.Supp. 2d 1283 (N.D. Ala. 2005), CV-01-152-VEH.

On July 16, 2007, the Court lifted the stay.  (Doc. 150).  On August 27, 2007, the Court granted Plaintiff's Third Motion for Summary Judgment on Liability, filed April 5, 2007  (Doc. 132).  In its August 27, 2007, Order (Doc. 153), the Court ruled that "[j]udgment will be entered in favor of [Plaintiffs] and against TVA for the following violations of the Clean Air Act, the Alabama SIP and TVA's Title V permits taking place between January 3, 2000, and September 30, 2002:

> - Colbert 1 - 4: 2,351 separate six minute violations; 784 greater than 20 % and less than 25 %; 1,567 greater than 25 % opacity;
>
> - Colbert 5: 1,038 separate six minute violations; 541 greater than 20 % and less than 25 percent; 497 greater than 25 %."

(*Id.*)

On May 23, 2008, the Court entered an order governing remedies discovery and setting this matter for trial. (Doc. 173).  The remedies trial commenced on December 15, 2008.[1]  The issues at trial were "whether injunctive relief is required

---

[1]  Pursuant to *Sierra Club*, legal remedies, *i.e.* civil penalties, were not available.

and what, if any, form such relief should take." (Doc. 173 at 3). The Court has admitted evidence from the parties in the form of testimony[2] and exhibits admitted into evidence.

For the reasons stated, the Court finds and concludes that injunctive relief is not required and that this case is due to be dismissed. Based on the evidence and arguments presented, and pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

## II.    FINDINGS OF FACT

A.    The Parties, Jurisdiction and Standing

1.    Plaintiffs Alabama Environmental Council and Sierra Club are non-profit membership organizations.

2.    The Tennessee Valley Authority is a corporate agency or instrumentality of the United States.

3.    This Court has previously found that plaintiffs have standing to bring this action. Memorandum Opinion on Plaintiffs' Third Motion for Summary Judgment on Liability, Doc. 152, at 10.

4.    The Court has subject matter jurisdiction over this case pursuant to 42 U.S.C. § 7604(a) and 28 U.S.C. § 1331.

---

[2] The Court found all of the witnesses to be knowledgeable, articulate, and candid in their testimony, and all counsel to be knowledgeable and well-prepared. It was a pleasure to try this case.

B.     The Colbert Plant

5.     TVA is the owner and operator of the Colbert Fossil Plant ("Colbert"), which is located in Tuscumbia, Alabama.

6.     Colbert is a fossil-fuel-fired electric generating facility consisting of five separate units that are operated to generate electricity.

7.     The five units at Colbert generate electricity by burning coal to create steam, and then passing that steam through a turbine to drive a generator that ultimately produces electricity.

8.     Colbert generates about 7.8 billion kilowatt hours of electricity annually, enough to supply approximately 500,000 homes.

9.     Airborne coal combustion by-products are exhausted by Colbert Units 1-4 through a common stack and by Unit 5 through a second stack.

C.     Opacity, Particulate Matter, and Continuous Opacity Monitoring Systems

10.    When Colbert produces electricity by burning pulverized coal in the furnace of a unit, the coal burning process releases by-products in the form of flue gas that makes its way through the pollution control devices and to the atmosphere through stacks.  Among these combustion by-products in the flue gas are solid particles (primarily flyash), the principle component of the normal visible emissions from the coals presently being burned at Colbert.

11.     The term "opacity" refers to the extent to which a plume of smoke reduces the transmission of light and obscures vision.  For example, a plume with 20% opacity blocks 20% of light passing through it; no light passes through a plume with 100% opacity.

12.     Opacity is not a pollutant, but instead is a measure of the light-blocking property of a plant's emissions.

13.     Continuous particulate monitoring systems are commercially available.

14.     Currently, using the equipment located at Colbert, there is no way to determine continuous particulate emissions there.

15.     A continuous opacity monitoring system ("COMS") is a device that monitors continuously the opacity of a plume of smoke.

16.     A COMS operates by passing a beam of light from the inside of one side of the stack across the exhaust path to a reflector which returns the light to the opacity sensor.  The opacity sensor measures the attenuation of light from the stack's emissions.

17.     Opacity serves as a surrogate for determining continuous compliance with particulate matter standards.

18.    Particulate matter is the generic term for a broad class of chemically and physically diverse substances that exist as discrete particles (liquid droplets or solids) over a wide range of sizes.

19.    Particulate matter can be broadly classified as either primary particulate matter (i.e., particles that are emitted directly) or secondary particulate matter (i.e., formed in the atmosphere by transformations of gaseous emissions such as sulfur oxides (SOx), nitrogen oxides (NOx), and volatile organic compounds).

20.    The particles contributing to the opacity of a plume that is measured by a COMS are primary particles, and not secondary particles.  This is so because secondary particulate matter is formed outside the stack, and the COMS that takes opacity measurements inside the stack does not detect gaseous compounds such as sulfur dioxide (SO2), nitrogen oxide (NOx), or condensable particulate matter.

21.    Unless the Court specifically indicates otherwise, all references to "particulate matter" hereafter are references to primary particulate matter, and not to secondary particulate matter.

D.    The Colbert Plant's Permit and Applicable Regulations

22.    Colbert Units 1-4 and Unit 5 exhaust through separate stacks, are separately permitted, and have separate COMS.

23.    For opacity regulatory purposes, Colbert Units 1-4 and Unit 5 are treated as two separate sources.

24.    Accordingly, the Court will separately examine the evidence relating to the opacity performance and remedial actions for Units 1-4 (which exhaust through one stack) and Unit 5 (which exhausts through another).

25.    Colbert operates pursuant to a Title V Permit issued by ADEM and reviewed by the EPA.  The current Title V Permit pursuant to which Colbert operates was issued on April 1, 2004.

26.    Colbert's current Title V Permit is not the same permit that this Court ruled that TVA violated.

27.    In relevant part, Colbert's current Title V Permit excuses otherwise non-exempt exceedances (as hereinafter defined) at Colbert, provided that any non-exempt exceedance is brought below 20% within 2 hours.

28.    There are certain specific events which are exempted by the SIP such that opacity may exceed 20% during those events without violating the SIP.

29.    None of the exceedances which the Court found to be violations in its Memorandum Opinion on Plaintiffs' Third Motion for Summary Judgment on Liability (Doc. 153) fell within any recognized exemption.

30.    None of the exceedances presented to the Court during the trial fell within any recognized exemption.

31.     The Court will hereinafter refer to exceedances which do not fall within any recognized exemption as "non-exempt exceedances."

32.     Actual particulate matter emissions are required to be measured once a year at Colbert, using the Method 5 test.

33.     The results of the Method 5 test show whether the unit being measured can comply with the particulate matter emission level mandated for Colbert, that is, 0.12 MMBtu.

34.     At the same time that the Method 5 test is conducted, opacity is also measured and recorded.

35.     This allows opacity levels to be correlated to the actual particulate matter emission rate at the time of measurement.

36.     If the plant operates poorly, the opacity level will go up because the particulate matter emissions will go up.

37.     However, a non-exempt exceedance does not necessarily mean that more pollution has escaped into the air outside a stack.

38.     20% opacity correlates to a particulate matter emission of 0.12MMBtu.

39.     Pursuant to Colbert's current Title V Permit, TVA submits quarterly reports to ADEM listing each COMS reading over 20%, categorizing

each such reading as exempt or non-exempt, and providing a reason code for each

such reading.

40.     Colbert's quarterly ADEM reports for 2006, 2007, and the first

three quarters of 2008 are on file with the Court, as follows:

| Quarter | Reference |
|---|---|
| 1st Quarter 2006 | Ct. Doc. 157-5 |
| 2nd Quarter 2006 | Ct. Doc. 157-6à157-8 |
| 3rd Quarter 2006 | Ct. Doc. 157-9 |
| 4th Quarter 2006 | Ct. Doc. 157-10 |
| 1st Quarter 2007 | Ct. Doc. 157-11 |
| 2nd Quarter 2007 | Ct. Doc. 157-12 |
| 3rd Quarter 2007 | Ct. Doc. 157-13à157-14 |
| 4th Quarter 2007 | Ct. Doc. 172-3 |
| 1st Quarter 2008 | Ct. Doc. 172-2 |
| 2nd Quarter 2008 | Ct. Doc. 174-2 |
| 3rd Quarter 2008 | Ct. Doc. 179-2 |

41.     Testimony at trial established the COMS readings at Colbert

from October 1, 2008 through the date of such testimony (December 16, 2008).

E.     The Colbert Plant's Pollution Controls and Improvement Activities for
       Opacity

42.     To control particulate emissions and opacity, TVA operates

electrostatic precipitators ("ESPs" or "precipitations") at each of its five Colbert

units.

43.     TVA replaced the ESPs for Units 1-4 (completing the work in

approximately 1990) in order to allow TVA to burn "low-sulfur" coal.

44.   The ESP currently operating on Unit 5 was put in service during the 1970s, and was rehabilitated in a project completed in January 2008, at a cost of approximately $45 million.

45.   The basic process by which an ESP works to capture flyash from the flue gas is to remove particles from the gas exhaust stream by electrically charging the particles and then attracting them to collection plates having the opposite charge.

46.   ESP's are the most widely used means of controlling particulate emissions from coal-fired power plants located east of the Mississippi River.

47.   At Colbert, the flue gas and flyash effluent from the furnace are uniformly distributed before entry into the precipitator at the precipitator inlet, then expanded to reduce the gas velocity and increase the time for collection of the flyash particles, then passed through gas passages between electrically charged discharge electrodes and grounded solid collector plates.  The discharge electrodes are charged by a high voltage grid and frame, with the electric current and voltage supplied from transformer-rectifier power supplies (TR sets) and controls that increase the voltage and rectify the alternating current to direct current.  The flyash is charged while passing through the gas passages, and most of the flyash is attracted to the grounded collector plates of opposite polarity.  The plates and discharge electrodes are periodically cleaned by striking them with internal rotating

hammers (a process called "rapping").  This releases the flyash, which slides or falls into the ash hoppers below the ESPs.  The flyash in the hoppers is periodically emptied by an ash evacuation and ash handling system.

48.    In the coal combustion process, opacity can increase as a result of events that cause a greater amount of flyash or unburned coal to be created or added to the flue gas stream than occurs during normal plant operations.  For example, elevated opacity readings can be caused by problems with the coal feeders, coal pulverizers, ash hoppers, fans and dampers, air preheaters, control equipment, and ignition systems.  Similarly, elevated opacity readings can be caused by necessary operations such as sootblowing (the use of high-pressure blowers for on-line cleaning of accumulated boiler ash and slag deposits).  Further, the coal combustion process itself is inherently highly variable, and the opacity of emissions is affected by varying operating conditions as well as the varying coal and ash characteristics of the fuel used.

49.    In the pollution control process, opacity also can increase as a result of events that cause the pollution controls to fail to capture as much of the flyash as is captured during normal plant operations.  For example, malfunctions in the ESPs – such as the sudden loss of operability of a portion of a precipitator – can cause opacity to rise, reflected in higher COMS readings.  Similarly, as noted

above, varying operating conditions as well as the varying coal and ash characteristics of the fuel used can affect ESP performance.

50.    Coal-fired power plants such as Colbert are massive facilities with thousands of working components.  The ESP is also subject to wear and corrosion on components.  Accordingly, it is inevitable that sometimes combustion process variability, upset conditions, and unforeseeable malfunctions occur and result in unpreventable increased opacity.

51.    When something occurs that results in increased opacity at Colbert, an alarm goes off and plant personnel respond to the situation by reducing load while they determine the cause of the problem and attempt to correct it.

52.    Often, a sudden increase in the opacity reading displayed by the COMS is the plant's first indication that there has been a malfunction or upset condition requiring action.

53.    In addition to reactive actions that can be taken to address elevated opacity when it occurs, there are proactive actions that can be taken in an effort to reduce the likelihood of the kind of upset conditions that can result in elevated opacity.  Actions that can be taken to improve opacity performance at a coal-fired power plant like Colbert can be separated broadly into two groups:  (1) changes to procedures and administrative processes and (2) physical changes.

54.    Plant operating processes and procedures direct the actions that Colbert staff should take to maintain and operate properly the combustion and particulate control equipment and to respond to events that increase stack opacity levels.

55.    Physical changes also affect opacity levels both in the formation of opacity and the control of particulates that contribute to opacity levels.  Physical changes can be broadly separated into two groups:  (1) changes to combustion processes and controls; and (2) improvements in particulate controls equipment.  Improving combustion process controls lowers baseline opacity and enables plant staff to respond more quickly to combustion events that can increase opacity levels, thereby mitigating such spikes.  Improvements in particulate control equipment typically also result in improvements in opacity performance.

56.    Since 2002, TVA has taken specific action to address not only non-exempt exceedances but also exempt opacity readings over 20% (such as during plant startup and shutdown), thus going beyond the requirements of the SIP and Colbert's current Title V Permit's provisions.

57.    The single most effective action taken by TVA to reduce opacity at Units 1 through 4 has been increased operator attentiveness - that is, an increased operator awareness of opacity exceedances and an increased effort to reduce the duration and magnitude of such exceedances.

1.      *Actions Common to All Units*

58.     TVA has completed the following activities that have improved the plant's opacity performance for all five units.

| Action | Date | Cost |
|---|---|---|
| 1.  Develop a prompt to respond to increasing opacity levels and exceedances | 8/7/02 | Labor |
| 2.  Write procedure for precipitator use during shutdowns and unit off-line conditions and train unit operators | 8/14/02 to 10/14/02 | Labor |
| 3.  Put opacity data in front of Dry Flyash Assistant Unit Operator | 10/9/02 | $20,000 |
| 4.  Put opacity data in front of Unit Operator by moving CEMS personal computer | 10/12/02 | $10,000 |
| 5.  Daily management-level review of opacity performance | 10/14/02 | Labor |
| 6.  Write soot blowing procedure that addresses operational concerns, including opacity | 10/31/02 | Labor |
| 7.  Track ash removal system vacuum data | 10/31/02 | Labor |
| 8.  Write procedure for opacity coding | 10/31/02 | Labor |
| 9.  Write opacity response guideline | 11/08/02 | Labor |
| 10. Add opacity alarms | 12/31/02 | $25,000 |
| 11. Improve dry ash handling | 9/30/03 | $400,000 |
| 12. Replace Texas Instrument controls for Dry Flyash system | 4/30/06 to 5/31/06 | $350,000 |
| **Total** | | **$805,000 plus Labor** |

16

59.     The ash removal process in the precipitator deposits flyash into the ash hoppers.  The Dry Flyash Handling System then removes the flyash from the precipitator hoppers.  If, for any reason, the Dry Flyash System fails to remove the flyash, it builds up in the hopper, which can negatively affect ESP (for example, by causing inadvertent grounding of electrical sections of the precipitations), resulting in an increase in opacity.  The Dry Flyash project at Colbert corrected reliability problems with this system, which directly improved ESP reliability and performance.

60.     The rest of the actions taken above were procedural or equipment improvements aimed at keeping the operators better informed of opacity in real time and helping them determine what actions/instructions are best to control it.

61.     These procedural changes and equipment improvements have contributed to improved opacity performance for all units at Colbert.

2.    *Actions Specific to Units 1-4*

62.    TVA has also completed the following activities specific to Units 1-4 that have improved the opacity performance for Units 1-4.

| Action | Unit | Date | Cost |
|---|---|---|---|
| 1.  Replace Sootblowers 1-12 | 3 | 5/1/02 | $950,000 |
| 2.  Initiate procedure to avoid simultaneous soot blowing and load changes | 1-4 | 8/12/02 | Labor |
| 3.  Replace Sootblowers 1-12 | 1 | 12/31/02 | $950,000 |
| 4.  Replace Sootblowers 1-12 | 2 | 9/30/03 | $950,000 |
| 5.  Replace Sootblowers 1-12 | 4 | 9/30/03 | $950,000 |
| 6.  Installed opacity monitors on each unit to use for unit level trending and troubleshooting | 1-4 | 6/30/04 | |
| 7.  Implement burner management systems project | 1-4 | 11/5/05 | $9,562,000 |
| 8.  Replace damper operators | 1-4 | 11/5/05 | $288,000 |
| 9.  Add opacity data to Dataware program for each unit | 1-4 | 12/31/05 | $20,000 |
| 10. Reset and clean burner dampers | 1 | 2/28/06 | $60,000 |
| **Total** | | | **$13,730,000 plus Labor** |

63.    The coal combustion process creates byproducts which, if not cleaned continuously, will accumulate on the boiler's heat transfer surfaces and negatively impact operation of the boiler.

64.    Sootblowers are mechanical devices that are used periodically for on-line cleaning of accumulated deposits of boiler byproducts.  They direct a cleaning medium (usually steam, compressed air, or water) through nozzles against

the soot or ash accumulated on the heat transfer surfaces of boilers to remove the deposits and maintain the heat transfer efficiency.

65.     Sootblowing is a necessary operational practice in the operation of a coal-fired boiler.

66.     If sootblowers are unreliable, greater accumulations of ash and slag occur, and the removal of these greater accumulations of ash and slag can have greater impact on opacity.

67.     TVA has improved the opacity performance at Colbert Units 1-4 both by improving sootblowing procedures and by investing nearly $4 million in the purchase and installation of new sootblowers.

68.     TVA spent nearly $10 million implementing a burner management systems project, with a beneficial effect on opacity performance, including during exempt startup and shutdown periods.

3.     *Actions Specific to Unit 5*

69.     TVA has completed the following activities specific to Colbert Unit 5 that have improved the opacity performance of Colbert Unit 5.

| Action | Date | Cost |
|---|---|---|
| 1.  Replace Sootblowers 1-12 | 5/1/02 | $650,000 |
| 2.  Upgrade coal feeders and modify bunker hoppers | 4/30/04 | $1,875,000 |
| 3.  Replace Air Flow Measurement Devices | 4/30/04 | $250,000 |

| 4.  Upgrade Air Flow Damper Operators | 4/30/04 | $935,000 |
|---|---|---|
| 5.  Upgrade TR Set Controls | 5/1/07 | $249,000 |
| 6.  Rehabilitation of Unit 5 ESP | 2/2/08 | $46,371,000 |
| 7.  Combustion Control Replacement | 2/2/08 | $17,568,000 |
| 8.  Air Preheater Replacement | 2/2/08 | $7,672,000 |
| **Total** | | **$75,570,000** |

70.    The largest improvement in opacity performance for Unit 5 has resulted from the rehabilitation of the Unit 5 ESP.

71.    The ESP rehabilitation project took place during a scheduled outage that started on September 29, 2007, and ended in January, 2008.

72.    This project involved cutting the roof off of the precipitator; replacing everything inside with new, more modern components; replacing the transformer rectifier (TR) set power supplies with a more advanced design power supply called high frequency power supplies (HFPS); and increasing the number of power supplies from 16 to 32.  The rehabilitated ESP is also designed to maintain access to sections of the precipitator while the unit and other precipitations are operating.

73.    The project's result was an ESP with all new components and systems (except casing, structure, and ash handling system), including modern power supplies and controls, while retaining the capability of maintaining the precipitator while the generating unit is in operation.

74.    The ESP is designed to be capable of operation throughout all unit operations with Unit 5 either in operation or out of service, including throughout startups and shutdowns.

75.    The refurbishment of the Unit 5 ESP included a number of design improvements and upgrades to improve performance of the unit with respect to opacity.   The original ESP on Unit 5 was designed with 1960's technology and a 1960's understanding of how ESP's operate.   Significant advances in ESP technology have taken place since the 1960's.   The refurbished ESP at Colbert Unit 5 was designed with current technology.   While some of the work involved the repair or replacement of broken equipment, TVA also implemented significant design improvements for the ESP.   This included the addition of 32 power supplies and the addition of rigid discharge electrodes (RDE) in the inlet field.

76.    The Court finds that Unit 5 has sufficient capacity and redundancy to maintain opacity at levels below 20%, even under adverse conditions that are unlikely to occur.   Specifically, computer modeling of Colbert Unit 5 predicts that, even with two fields out of service in the precipitator, the opacity at full load would still be less than 5%.   Modeling also shows that even under extreme conditions that are unlikely to ever occur, the opacity at full load

would still be less than 10%.   Additionally, all Unit 5 exceedances in 2008 correlate to events that are not likely to recur.

77.   The Court credits the testimony of TVA's expert witness, Mr. Harrison, and finds that the 2007-2008 Unit 5 ESP projects resulted in improvements and upgrades to its performance capability.

78.   In summary, the Court finds that, since 2002, TVA has spent approximately $90 million on projects at Colbert Units 1-5, in addition to making changes in operating procedures, all of which have had a significant positive effect on improving opacity performance.

F.   The Colbert Plant's Opacity Performance

1.   *Background Findings*

79.   On August 27, 2007, the Court determined that TVA was liable for non-exempt opacity exceedances at its Colbert Fossil Plant between 2000 and 2002.   *See* August 27, 2007 Order on Plaintiffs' Third Motion for Summary Judgment on Liability (Doc. 153).

80.   Between January 3, 2000, and September 30, 2002 – i.e., eleven calendar quarters, or 2 ¾ years – the Court determined that Colbert committed 2,351 separate six-minute violations for Units 1-4 and 1,038 separate six-minute violations for Unit 5.   *Id.*   This equates to an average of 855 separate six-minute

violations per year for Units 1-4, and 377 separate six-minute violations per year for Unit 5.

81.    During that time, as this Court has found, "TVA was consistently told by ADEM that its COMS data showed no violation because it was within the 2% *de minimis* rule," and "TVA was reasonable in believing that ADEM's practices ... were 'facially valid.'"  Indeed, based on the 2% *de minimis* rule, the Alabama Attorney General formally declared TVA's opacity performance at that time to have been "in compliance".  TVA's good faith belief of opacity compliance during 2000-2002 was shown by the uncontradicted testimony of Colbert's Engineering Manager, Mr. Littrell.  It is undisputed that TVA's operations during the 2000-2002 period – and at all times since then – were within ADEM's legally deficient 2% *de minimis* rule because non-exempt exceedances occurred less than 2% of the time per calendar quarter.

82.    The positive effect of the equipment upgrades and changes in operating procedures at Colbert is demonstrated by the plant's opacity record in recent years.

83.    Between January 1, 2006 (the first quarter after the Eleventh Circuit's reversal of this Court's dismissal of this action, which invalidated the 2% *de minimis* rule upon which TVA had been relying) and the third quarter of 2008 (the last complete quarter preceding the trial), a period exactly equal to the 2 ¾

years covered by the violation period, TVA's opacity performance has been as follows.

| Year | Units 1-4 – No. of Non-exempt Exceedances | Unit 5 – No. of Non-exempt Exceedances |
|---|---|---|
| 2006 | 78 | 436 |
| 2007 | 56 | 501 |
| 2008 (through 3rd Quarter) | 33 | 20 |
| Total | 167 | 957 |

   2.   *Unit 5's Performance Under TVA's Remediation Plan*

   84.   Currently, Colbert Unit 5's typical baseline opacity readings during normal unit operation measure about 2% to 4% on the COMS.

   85.   A list of each non-exempt COMS reading higher than 20% that Colbert Unit 5 has experienced through the first three quarters of 2008 is as follows.

| Date | Time | COMS Reading | Event Code/Description |
|---|---|---|---|
| 01/12/08 | 05:30 | 29.14 | 64 Unit Off – Testing Ignitors |
| 01/12/08 | 05:36 | 41.65 | 64 Unit Off – Testing Ignitors |
| 01/12/08 | 05:42 | 24.01 | 64 Unit Off – Testing Ignitors |
| 01/12/08 | 05:48 | 23.06 | 64 Unit Off – Testing Ignitors |
| 01/12/08 | 05:54 | 25.01 | 64 Unit Off – Testing Ignitors |
| 01/12/08 | 06:36 | 45.34 | 64 Unit Off – Testing Ignitors |
| 01/13/08 | 23:42 | 23.60 | 64 Unit Off – Testing Ignitors |
| 01/13/08 | 23:48 | 26.41 | 64 Unit Off – Testing Ignitors |
| 03/10/08 | 00:48 | 55.15 | 75 Precipitator Field Trip |
| 03/10/08 | 00:54 | 85.96 | 75 Precipitator Field Trip |
| 03/10/08 | 01:00 | 81.33 | 75 Precipitator Field Trip |
| 03/10/08 | 01:06 | 80.16 | 75 Precipitator Field Trip |

| 03/10/08 | 01:12 | 80.17 | 75 Precipitator Field Trip |
| 03/10/08 | 01:18 | 79.81 | 75 Precipitator Field Trip |
| 03/10/08 | 01:24 | 72.84 | 75 Precipitator Field Trip |
| 03/10/08 | 01:30 | 36.34 | 75 Precipitator Field Trip |
| 03/10/08 | 01:42 | 29.25 | 75 Precipitator Field Trip |
| 07/08/08 | 07:24 | 42.45 | 75 Precipitator Field Trip |
| 07/09/08 | 01:36 | 22.09 | 75 Precipitator Field Trip |
| 07/09/08 | 02:06 | 22.99 | 75 Precipitator Field Trip |

86.     There was only one non-exempt exceedance for Unit 5 during the period July 19, 2008, through December 16, 2008.

87.     Unit 5's performance during the period July 19, 2008, through December 16, 2008, shows that TVA has achieved excellent opacity performance at that Unit.

88.     The testimony and the exhibits establish that the non-exempt (and the exempt) exceedances experienced by Unit 5 since it was restarted in January, 2008, were associated with testing the rehabilitated pollution control equipment while Unit 5 was shut down or were problems encountered during the shake-down of the equipment after startup.  The Court finds that the non-exempt exceedances experienced by Unit 5 during the first three quarters of 2008 are not the kind of events that are likely to be repeated on an ongoing basis.

89.     The exceedances experienced by Unit 5 since it was restarted in January 2008 were short-term in nature.   TVA reacted promptly to each

exceedance and, in compliance with the current Title V Permit, each time reduced Unit 5's opacity to below 20% within two hours.

90.     The Court finds that Unit 5's performance during 2008, considered together with the nature and effect of the repairs and upgrades to Unit 5 and its ESP that were completed during the ESP remediation outage <u>and</u> the changes in operating procedures (that were made at all Units), demonstrate that Colbert Unit 5 is capable of operating with essentially no non-exempt COMS readings over 20%.

3.     *The Performance of Units 1-4 Under TVA's Remediation Plan*

91.     Currently, Colbert Units 1-4's typical baseline opacity readings during normal unit operation measure about 5% to 8% on the COMS.

92.     A list of each non-exempt COMS reading higher than 20% that Colbert Units 1-4 experienced during the first three quarters of 2008 is as follows.

| Date | Time | COMS Reading | Event Code/Description |
|------|------|--------------|------------------------|
| 01/14/08 | 15:18 | 47.98 | 38 Pulverizer Loss/Problems |
| 01/17/08 | 11:54 | 77.45 | 75 Precipitator Field Trip |
| 01/17/08 | 12:00 | 91.15 | 75 Precipitator Field Trip |
| 01/17/08 | 12:06 | 83.81 | 75 Precipitator Field Trip |
| 01/17/08 | 12:12 | 44.56 | 75 Precipitator Field Trip |
| 01/17/08 | 12:24 | 49.33 | 75 Precipitator Field Trip |
| 01/17/08 | 12:30 | 39.82 | 75 Precipitator Field Trip |
| 01/17/08 | 12:36 | 37.46 | 75 Precipitator Field Trip |
| 01/17/08 | 12:42 | 31.21 | 75 Precipitator Field Trip |
| 01/17/08 | 12:48 | 30.93 | 75 Precipitator Field Trip |
| 01/17/08 | 12:54 | 36.29 | 75 Precipitator Field Trip |

| 01/17/08 | 13:00 | 28.68 | 75 Precipitator Field Trip |
| 01/17/08 | 13:06 | 27.22 | 75 Precipitator Field Trip |
| 01/17/08 | 13:12 | 22.44 | 75 Precipitator Field Trip |
| 01/17/08 | 13:24 | 25.51 | 75 Precipitator Field Trip |
| 01/17/08 | 13:36 | 20.70 | 75 Precipitator Field Trip |
| 01/17/08 | 14:42 | 63.11 | 75 Precipitator Field Trip |
| 01/28/08 | 01:12 | 32.09 | 60 Sootblowing Boiler |
| 01/28/08 | 01:18 | 24.81 | 60 Sootblowing Boiler |
| 03/04/08 | 00:06 | 23.14 | 31 Changing Fuel and Air Flows |
| 03/04/08 | 06:18 | 27.59 | 31 Changing Fuel and Air Flows |
| 03/04/08 | 06:30 | 31.17 | 31 Changing Fuel and Air Flows |
| 04/11/08 | 14:48 | 20.65 | 60 Sootblowing Boiler |
| 04/11/08 | 14:54 | 23.81 | 60 Sootblowing Boiler |
| 05/09/08 | 17:36 | 58.52 | 38 Pulverizer Loss/Problems |
| 05/25/08 | 08:42 | 32.71 | 99 Missing Excuse Code |
| 06/23/08 | 09:18 | 42.79 | 31 Changing Fuel and Air Flows |
| 08/13/08 | 23:12 | 22.68 | 33 Loss of Coal Feeders |
| 08/13/08 | 23:18 | 26.63 | 33 Loss of Coal Feeders |
| 08/13/08 | 23:24 | 21.51 | 33 Loss of Coal Feeders |
| 08/22/08 | 08:24 | 21.08 | 31 Changing Fuel and Air Flows |
| 09/10/08 | 17:36 | 26.08 | 60 Sootblowing Boiler |
| 09/13/08 | 17:54 | 31.34 | 31 Changing Fuel and Air Flows |

93.   TVA has significantly reduced the number of non-exempt exceedances for Units 1-4, from an average of approximately 855 per year to approximately 60 per year on average for the past 2 ¾ years, with continually reduced numbers each year (that is, fewer exceedances during 2008 than during 2007, and fewer during 2007 than during 2006).

94.   There were only two non-exempt exceedances for Units 1-4 during the period from July 10, 2008, through December 16, 2008.

95.   The exceedances experienced by Unit 1-4 during 2008 were short-term in nature.   TVA reacted promptly to each exceedance and, in compliance with the current Title V Permit, each time reduced opacity to below 20% within two hours.

G.   There is Virtually No Likelihood of Future Non-Exempt Exceedances at Colbert (Units 1-4 and Unit 5)

96.   Although there have been non-exempt exceedances at all of Colbert's units in 2008, all of the performance data and testimony regarding such data show that these exceedances, exempt _and_ non-exempt, have occurred despite TVA's substantial efforts to reduce opacity exceedances.

97.   The performance data and testimony regarding such data further show that such exceedances have occurred suddenly, sporadically and infrequently, for short durations of time, and for a combined inconsequential portion of Colbert's operating time.

98.   The Court credits the testimony of Plaintiffs' expert witness, Mr. Powers, and further finds that the Colbert Unit 5's non-exempt exceedances will not increase over those shown for the 1st, 2nd, and 3rd quarters of 2008, and that such non-exempt exceedances could drop to zero, given the physical improvements to Unit 5, provided that TVA maintains current operational vigilance/attentiveness.

99.    The Court finds that the entire course of TVA's conduct since this lawsuit began has been to comply with the law and that, once TVA knew that the 2% *de minimis* rule, upon which TVA had been relying, was not legally adopted, it immediately and consistently acted to come into compliance with the 20% opacity limit in the SIP.   Therefore, the Court finds that there is no need to enjoin TVA to continue its current operational vigilance/attentiveness or to make further physical changes to its operations or its pollution control equipment.

100.    The Court further credits the testimony of Plaintiffs' expert witness, Mr. Powers, that performance at Colbert Units 1 through 4 is likely to degrade in the future, resulting in higher exceedances than those shown for the 1st, 2nd, and 3rd quarters of 2008.   However, even assuming that Mr. Powers was referring to non-exempt exceedances, which the Court finds would be a fair inference from the context of his testimony, the Court notes that: (1) Mr. Powers did not give any time reference for his testimony about "the future" (*e.g.* the next 12 months, the next 2 years, the next 10 years); and (2) Mr. Powers necessarily assumed that TVA would not make any future physical changes to Units 1-4, an assumption that was disproved by the testimony of Mr. Littrell, which the Court found credible, regarding how TVA constantly maintains and upgrades all its Colbert Units.   Accordingly, the Court assigns no weight to Mr. Powers's testimony that performance at Units 1-4 is likely to degrade in the future.

101.   There is virtually no likelihood that <u>avoidable</u> non-exempt exceedances will occur in the next several years at Colbert Units 1-4 or 5 as they are currently configured and operated.

H.   <u>There is Virtually No Likelihood of Future Violations of the SIP as Implemented by the Current Title V Permit</u>

102.   The performance data and testimony regarding such data further show that TVA reacted promptly to each 2008 non-exempt exceedance and, in compliance with the current Title V Permit, each time reduced opacity to below 20% within two hours.

103.   There is virtually no likelihood that TVA will fail to reduce any non-exempt exceedance that occurs in the next several years at Colbert Units 1-4 or 5 below 20% within 2 hours, as required by the current Title V Permit.

104.   The Court therefore finds that TVA has demonstrated that it will maintain compliance with the Clean Air Act and the SIP as implemented by Colbert's current Title V Permit.

I.   <u>Plaintiffs Have Failed to Establish Likelihood of Injury in the Future</u>

105.   The Court credits the testimony of Plaintiffs' expert Dr. Thurston and finds that there is no level of primary particulate matter concentration at which it can be determined that no adverse health effects occur.

106.    However, the Court finds that there is no evidence that any specific opacity exceedance at Colbert establishes that there has been a particulate matter emission in excess of Colbert's limit of 0.12 lb/MMBtu.

107.    The Court credits the testimony of Plaintiffs' expert Mr. Powers that an omissions exceedance event does not necessarily mean that more pollution has escaped from the stack.

108.    The Court finds that Plaintiffs failed to establish that any of their members have been injured in fact by any current (2008) non-exempt exceedance.

III.    **CONCLUSIONS OF LAW**

A.    The Clean Air Act

The Clean Air Act is codified at 42 U.S.C. §§ 7401-7671 (2000).  The implementing regulations are found at 40 C.F.R., pts. 50-99.  The original Act and the amending legislation can be found, respectively, at Clean Air Act Amendments of 1970, Pub. L. No. 91-604, 84 Stat. 1676 (1970); Clean Air Act Amendments of 1977, Pub. L. 95-95, 91 Stat. 685 (1977); Clean Air Act Amendments of 1990, Pub. L. No. 101-549, 108 Stat. 2399 (1990).

For the reader unfamiliar with prior opinions discussing the Act, the following is an overview of the Clean Air Act's scheme of joint state and federal

implementation involving State Implementation Plans, permits issued under Title V of the Act, and citizen's enforcement suits.

### 1.    State Implementation Plans ("SIPs")

The Clean Air Act strives "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  42 U.S.C. § 7401(b)(1).  The Clean Air Act sets out a two-stage process for achieving this goal.   In the first stage, EPA sets "national ambient air quality standards" for various pollutants.  42 U.S.C. § 7409.   In the second stage, each state creates and implements a plan, known as a "State Implementation Plan" or "SIP," to ensure its air meets the EPA standards.  *See* 42 U.S.C. § 7410.

Before implementing its plan, each state must submit a proposed SIP to the EPA for approval.  42 U.S.C. § 7410(a)(1).   To gain EPA approval, the SIP must "include enforceable emission limitations and other control measures, means, or techniques ... as may be necessary or appropriate to meet the applicable [Clean Air Act] requirements."  42 U.S.C. § 7410(a)(2).  Each state's SIP must "assure that national ambient air quality standards are achieved."**3**  42 U.S.C. § 7410(a)(2)(c).

---

[3]  Alabama's SIP is found at Ala. Admin. Code §§ 335-3-1-.01 - 336-3-1-.16.

Each state must revise its SIP periodically to account for new EPA standards and new emissions reduction technologies.  42 U.S.C. § 7410(a)(2)(H).  Like an entirely new SIP, any SIP revisions must be open to public hearing and comment and must be approved by the EPA.  42 U.S.C. § 7410(a)(1).  The EPA may also make what is known as a "SIP call," notifying a state of inadequacies in its current SIP and requesting that the state submit a revised plan.  *See* 42 U.S.C. § 7410(k)(5).

### 2.    *The Title V Permit and Citizen's Enforcement Suits*

In 1990, Congress amended the Clean Air Act to add Title V, *see* 42 U.S.C. §§ 7661-7661f, to assist in compliance and enforcement of air pollution controls. Clean Air Act Amendments of 1990, Pub.L. No. 101-549, §§ 501-507, 104 Stat. 2399, 2635-48 (1990).  "Under Title V, major stationary sources of air pollution are required to obtain an operating permit, which establishes the [Clean Air Act] requirements for, among other things, emission limitations relevant to the particular polluting source."  *Legal Envtl. Assistance Found., Inc. v. EPA,* 400 F.3d 1278, 1279 (11th Cir.2005).

The intent of Title V is to consolidate into a single document (the operating permit) all of the clean air requirements applicable to a particular source of air pollution.  The Title V permit program generally does not impose new substantive air quality control requirements.  Rather, a Title V permit "enable[s] the source,

States, EPA, and the public to understand better the  requirements to which the source is subject, and whether the source is meeting those requirements." Operating Permit Program, 57 Fed.Reg. 32,250, 32,251 (July 21, 1992) (codified at 40 C.F.R. § 70).

Title V authorizes each state to design its own stationary source permitting program and to submit that program to the EPA for approval.  42 U.S.C. § 7661a. When the state agency, here ADEM, issues a Title V permit, the terms of the permit must comply with that state's EPA-approved SIP.  *See* 40 C.F.R. § 70 (setting minimum requirements for state operating permit programs and standards for state-issued permits).

The proposed permit is subject to public notice and comments.  40 C.F.R. § 70.7(h)(4); *See also Sierra Club v. Johnson*, 436 F.3d 1269, 1273 (11th Cir. 2006) ("state permitting authorities must provide at least 30 days for public comment on draft Title V permits and must give 30 days notice of any public hearing.").  Each permit approved and issued by ADEM must also be submitted to EPA for review. *See* 42 U.S.C. § 7661d(b);  *see generally N.Y. Pub. Interest Research Group, Inc. v. Johnson,* 427 F.3d 172, 176 (2d Cir.2005).

The EPA may object to the permit and send it back to ADEM to correct the problem perceived by the EPA.  *Id.* at 176.  If EPA does not object within 45 days of receiving a proposed permit, "any person may petition the Administrator [to

make such an objection] within 60 days after the expiration of the 45-day review period ... based only on objections to the permit that were raised with reasonable specificity during the public comment period provided by the permitting agency ..." 42 U.S.C. § 7661d(b)(2).  Within 60 days of receiving such a petition, EPA must either grant the petition and make the proposed objection if the petitioner successfully demonstrates "that the permit is not in compliance with the requirements of this Act," or deny the petition.  *Id*. "Any denial of such petition shall be subject to judicial review under" 42 U.S.C. § 7607, a CAA provision concerning judicial review of agency actions.  *Id*.  That judicial review provision allows for direct review of "locally or regionally applicable" EPA actions in the court of appeals for the circuit in which the action arose, but also states that "[a]ction of the Administrator with respect to which review could have been obtained under [this section] shall not be subject to judicial review in civil or criminal proceedings for enforcement." 42 U.S.C. § 7607(b)(1)-(2).  *See also Romoland School Dist. v. Inland Empire Energy Center, LLC*, 548 F.3d 738 (9th Cir. 2008) (holding that the citizen suit provision of the CAA may not be used to challenge the validity of a Title V permit under applicable SIP requirements).

That is, a citizen suit may be brought to enforce compliance by a permittee with its Title V permit (which must incorporate the applicable SIP requirements),

but a citizen suit may not be brought to challenge the terms of any Title V permit.

42 U.S.C. § 7607(b)(1)-(2).  *See also Romoland*, 548 F.3d 738.

B.    The Standard for Issuance of a Permanent Injunction

The parties have agreed, and the Court finds, that the standard for issuing a

permanent injunction is set out in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S.

388, 126 S.Ct. 1837 (2006):

> According to well-established principles of equity, a plaintiff seeking
> a permanent injunction must satisfy a four-factor test before a court
> may grant such relief. A plaintiff must demonstrate: (1) that it has
> suffered an irreparable injury; (2) that remedies available at law, such
> as monetary damages, are inadequate to compensate for that injury;
> (3) that, considering the balance of hardships between the plaintiff and
> defendant, a remedy in equity is warranted; and (4) that the public
> interest would not be disserved by a permanent injunction.

*Id*. at 391.

As the Supreme Court recently stated, "[a]n injunction is a matter of

equitable discretion; it does not follow from success on the merits as a matter of

course."  *Winter v. NRDC, Inc.*, 129 S. Ct. 365, 381 (2008).   In other words,

"[s]imply because prospective injunctive relief is available . . . does not mean that

such equitable relief is appropriate."  *Simmons v. Conger*, 86 F.3d 1080, 1085

(11th Cir. 1996).  Instead, "[i]t is a bedrock principle of courts of equity that they

may impose the substantive remedy of injunctive relief *only* when fundamental

fairness and justice demand it." *Coral Springs Street Sys. v. City of Sunrise*, 371 F.3d 1320, 1340 (11th Cir. 2004) (emphasis in original).

These equitable principles apply with equal force to disputes arising under the Clean Air Act. As the Supreme Court has long recognized, "a major departure from the long tradition of equity practice should not be lightly implied." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-313, 102 S.Ct. 1798 (1982) (quoted with approval in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. at 391). The Supreme Court has clearly stated that the incorporation of the civil penalty section into the citizen suit provision of the Clean Water Act "must be read as encompassing all the terms of the penalty provisions..." *U.S. Dep't of Energy v. Ohio*, 503 U.S. 607 at 617, 112 S.Ct. 1627 at 1634 (1992). The Clean Air Act does not contain the necessary clear statement of any intent to exclude injunctive relief from the types of penalties available in citizen suits under the Act. *See Sierra Club v. Franklin County Power of Illinois, LLC*, 546 F.3d 918, 934 - 935 (7th Cir. 2008) ("[W]e agree that 'a plain reading of the statute' implies 'that the [injunctive remedies provision] applies to' [citizen suits under the Clean Air Act].") (internal citation omitted). Moreover, it is the law of this case that injunctive relief, including coercive fines, are available remedies in this action. *See Sierra Club v. Tennessee Valley Authority*, 430 F.3d 1337, 1356 (11th Cir. 2005) ("there are

37

authorized remedies against [TVA], such as declaratory and injunctive relief...").
*See also*, 42 U.S.C.A. § 7604(a) (2000).

Thus, although the Clean Air Act provides that a district court has jurisdiction "to enforce . . . an emission standard or limitation," 42 U.S.C. § 7604(a), "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as a chancellor in equity is not mechanically obligated to grant an injunction for every violation of law." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313. *See also Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 60 (1975); *Hecht Co. v. Bowles*, 321 U.S. 321, 328-29 (1944). Actions under the Clean Air Act are subject to these same principles. *See Ala. Air Pollution Control Comm'n v. Republic Steel Corp.*, 646 F.2d 210 (5th Cir. 1981)[4] (district court's refusal to grant injunctive relief upheld despite the defendant's violation of the Alabama SIP's particulate matter emission limitation).

C.    Plaintiffs Have Failed To Establish that A Permanent Injunction Should Issue

---

[4] *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (holding that decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in the Eleventh Circuit).

### (1)    No Irreparable Injury Has Been Shown[5]

One of the elements that a plaintiff must establish is irreparable harm.  An injunction "is available not simply when the legal right asserted has been infringed, but only when that legal right has been infringed by an injury . . . which will result in irreparable harm if the injunction does not issue." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127 (11th Cir. 2005); *see, e.g., Rondeau, supra*, 422 U.S. at 56 (no injunction where the injury "fell far short of the irreparable harm necessary to support an injunction").  For this reason, "[a] showing of irreparable injury is the 'sine qua non of injunctive relief,'" *Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc), and "[e]nvironmental litigation is not exempt from this requirement." *United States v. Lambert*, 695 F.2d 536, 540 (11th Cir. 1983).

-----

[5]  Although this Court initially stated that, because there was no legal remedy (because TVA's sovereign immunity prevents the imposition of any civil fines), irreparable injury would be presumed and it would be TVA's burden to rebut that presumption, the Court, prior to the beginning of the trial, stated that it recognized that such a presumption was legally erroneous, and that no such presumption would apply.  The Plaintiffs asserted surprise at this admittedly late announcement by the Court and the Court stated that, although the trial would begin as scheduled, the Plaintiffs could inform the Court, no later than 9 a.m. the morning of the second day of trial, if they wanted to request a continuance of the trial and the request would be granted.  The Court further informed the Plaintiffs that, if the Plaintiffs did not make such a request, the Court would consider the Plaintiffs to have waived any claim of error resulting from surprise.  The Plaintiffs never informed the Court that they wanted a continuance and the case was tried to conclusion.

"[T]he irreparable injury rubric is intended to describe the quality or severity of the harm necessary to trigger equitable intervention." *Lewis v. S.S. Baune*, 534 F.2d 1115 (5th Cir. 1976) (internal quotation marks omitted).  A court will not issue injunctive relief if "[t]he conduct sought to be enjoined [is] not the type of conduct that would cause any great injury." *Id.*; *see also Weinberger, supra*, 456 U.S. at 311-12 (*quoting Consol. Canal Co. v. Mesa Canal Co*., 177 U.S. 296, 302 (1900)) (an injunction will not issue "'to restrain an act the injurious consequences of which are merely trifling.'").  In the specific context of claimed environmental harms, the Supreme Court has described "irreparable" harm as being "[e]nvironmental injury" that is "permanent or at least of long duration." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).

As stated in the Court's Findings of Fact, the Plaintiffs have failed to prove any injury in fact.  Moreover, even if the Court were to assume that such injury occurred, the Plaintiffs have failed to show that any non-exempt exceedances since January 1, 2008, are preventable, were numerous, are likely to recur, or were of long duration.  Indeed, the Court has specifically found to the contrary.  Further, because the current Title V Permit excuses all of the non-exempt exceedances shown for 2008, because those non-exempt exceedances were brought below 20% within two hours, as specifically required by the current Title V Permit, the Court

finds that there is a total lack of evidence that TVA is operating Units 1-4 or Unit 5 in violation of *existing* law.

Thus, the Plaintiffs have failed to meet the first test for injunctive relief.

> (2)    *No Legal Remedies Exist to Compensate for Plaintiffs' Injuries*

Because the 11th Circuit affirmed this Court's determination that sovereign immunity prevents the assessment of civil fines against TVA, Plaintiffs have met the second test for injunctive relief.

> (3)    *The Balance of Hardships between Plaintiffs and TVA Do Not Warrant the Imposition of an Injunction*

As stated in Section III. C. 1, *supra*, because of the impact of the current Title V Permit, which now excuses all of the non-exempt exceedances shown for 2008 (because they each were brought below 20% within two hours, as required by the Permit), the Court finds that there is a total lack of evidence that TVA is operating Units 1-4 or Unit 5 in violation of existing law.

"Equitable relief is a prospective remedy, intended to prevent future injuries," *Adler v. Duval County School Bd.*, 112 F.3d 1475, 1477 (11th Cir. 1997), and for that reason "[t]he sole function of an action for injunction is to forestall future violations." *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952). *See also Reich v. Occupational Safety & Health Review Comm'n*, 102 F.3d

1200, 1202 (11th Cir. 1997) ("injunctive relief . . . addresses only ongoing or future violations").   Thus, "[w]hen the threat of future harm dissipates, the plaintiff's claims for equitable relief become moot because the plaintiff no longer needs protection from future injury."  *Adler*, 112 F.3d at 1477.

Factually, it is undisputed that the Colbert Plant operates in full compliance with the its current Title V Permit.  Indeed, Plaintiffs have not claimed that Colbert is in violation of Colbert's current Title V Permit.  That Permit is a shield to any claim by Plaintiffs that actions by TVA in accordance with the Permit violate the Clean Air Act or the Alabama SIP.  *See Sierra Club v. E.P.A.*, 2008 WL 5264663, 1 (D.C. Cir. 2008) (December 19, 2008) ("Title V further creates a 'permit shield' for sources, ensuring that compliance with the permit is 'deemed compliance with other applicable provisions' of the [Clean Air Act]. [42 U.S.C.] § 7661 c(f).").

TVA has affirmatively shown that it is entitled to the "permit shield" from and after the date it was issued (in 2004).  Thus, the Plaintiffs fail to meet the third test for injunctive relief.

### (4)   *The Public Interest Would Be Disserved by a Permanent Injunction*

A fourth component in determining the propriety of injunctive relief is that "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of

injunction." *Weinberger, supra*, 456 U.S. at 312. Because the Court has determined that the Plaintiffs have not shown any past willful[6] or current[7] violation of the law, or even any non-speculative risk of *avoidable* non-exempt exceedances of significant magnitude, duration, or frequency, and because any coercive fines or injunctive mandates of this Court would be passed on to TVA's 500,000 customers, the Court finds, based on the trial record, that the public interest would be disserved by entry of a permanent injunction.

Additionally, the Court finds that an injunction would be an excessively intrusive remedy, because it could entail continuing supervision of TVA's activities by this Court. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 193 (2000).

D. <u>Alternatively, this Case is Due To Be Dismissed as Moot</u>

Alternatively and independently, this case is due to be dismissed as moot.

---

[6] Indeed, the evidence is that TVA at all times complied with what it reasonably (but incorrectly) believed was the law (the 2% *de minimis* rule). The evidence is further that, since TVA learned that the 2% *de minimis* rule is legally deficient, TVA has continuously and at great expense made improvements in operating procedures and equipment, including pollution control equipment, such that, in 2008, TVA operated with no *avoidable* non-exempt exceedances, the non-exempt exceedances were few and of short duration, and all of such exceedances were brought below 20% within the two hours required by TVA's current Title V Permit for Colbert.

[7] Because of TVA's compliance with the current Title V Permit for Colbert.

A case seeking injunctive relief based on conduct that has become lawful due to a change in the law is rendered moot by the change in law.  *See*, *e.g.*, *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 482 (1990).  *See also Bankwest, Inc. v. Baker*, 446 F.3d 1358, 1364 (11th Cir. 2006) ("a case can become moot . . . '[due to] a change in the law'") (quoting *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1328 (11th Cir. 2004)).  A threat of future violations of a statutory or regulatory program dissipates when the governing statute or regulation is modified or clarified in a way that makes clear that the challenged conduct at issue is lawful.

Because the threat of any future violation or harm has dissipated, there is no factual or legal ground to impose injunctive relief, and the case has become moot.  "If the court determines at any time that it lacks subject-matter jurisdiction, the court *must* dismiss the action."  Fed. R. Civ. P. 12(h)(3) (emphasis added).  Such is the case when an action becomes moot – "[d]ismissal of a moot case is required because mootness is jurisdictional."  *Sierra Club v. EPA*, 315 F.3d 1295, 1299 (11th Cir. 2002).

## IV.   <u>CONCLUSION</u>

Plaintiffs have failed to show that they are entitled to injunctive relief.  As there is no further matter to be decided by this Court, this case is due to be dismissed.

Alternatively and independently, the Court finds that this lawsuit has become moot and, accordingly, the Court lacks jurisdiction over it. The case is therefore due to be dismissed.

A separate Order will be entered.

**DONE** this the 5th day of January, 2009.

**VIRGINIA EMERSON HOPKINS**
United States District Judge